Hector Gutierrez
1015Rosewood Ave
Inglewood CA. 90301
heg254@aol.com
424-200-1504
Pro Per

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF MISSOURI

# EASTERN DIVISION

| | |
|---|---|
| HECTOR GUTIERREZ, <br><br> an individual, <br><br>         Plaintiff, <br><br> vs. <br><br> 23ANDME, INC., a California corporation; ANNE WOJCICKI, an individual; TTAM RESEARCH INSTITUTE, a California corporation; 23andMe Holding Co. (Case No. 25-40976) 23andMe, Inc. (Case No. 25-40977) [Already named] 23andMe Pharmacy Holdings, Inc. (Case No. 25-40978) Lemonaid Community Pharmacy, Inc. (Case No. 25-40979) Lemonaid Health, Inc. | **CASE NO. 25-40976-357** <br><br> **ADV. PROC. NO. 25-04043-357** <br><br> **AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF.**1.  NEGLIGENCE (AGAINST ALL DEFENDANTS) 2.     GROSS NEGLIGENCE (AGAINST ALL DEFENDANTS) 3.     BREACH OF CONTRACT (AGAINST 23ANDME, INC.) 4.     BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST 23ANDME, INC.) 5.     UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS) 6.     CONVERSION (AGAINST |

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 1

| | |
|---|---|
| (Case No. 25-40980)<br>Lemonaid Pharmacy Holdings Inc.<br>(Case No. 25-40981)<br>LPharm CS LLC (Case No. 25-40982)<br>LPharm INS LLC (Case No. 25-40983)<br>LPharm RX LLC (Case No. 25-40984)<br>LPRXOne LLC (Case No. 25-40975)<br>LPRXThree LLC (Case No. 25-40985)<br>LPRXTwo LLC (Case No. 25-40986)<br><br><br>and DOES 1–20, inclusive,<br>    Defendants. | 23ANDME, INC. AND TTAM)<br>7.    FRAUDULENT<br>CONCEALMENT (AGAINST<br>23ANDME, INC. AND ANNE<br>WOJCICKI)<br>8.    INVASION OF PRIVACY –<br>PUBLIC DISCLOSURE OF PRIVATE<br>FACTS (AGAINST ALL<br>DEFENDANTS)<br>9.    NEGLIGENT AND<br>INTENTIONAL INFLICTION OF<br>EMOTIONAL DISTRESS (AGAINST<br>ALL DEFENDANTS)<br>10.    CIVIL CONSPIRACY<br>(AGAINST ALL DEFENDANTS)<br>11.    VIOLATION OF CALIFORNIA<br>CONSTITUTION, ARTICLE I, §§ 1 &<br>7 (AGAINST ALL DEFENDANTS)<br>12.    VIOLATION OF FOURTH AND<br>FOURTEENTH AMENDMENTS – 42<br>U.S.C. § 1983 (AGAINST ALL<br>DEFENDANTS ACTING UNDER<br>COLOR OF LAW) |

## **PREAMBLE**

"Plaintiff Hector Gutierrez, by and through himself pro se, alleges as follows":

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 2

## STATEMENT ON PROCEDURAL POSTURE

Plaintiff hereby states, in accordance with the Court's Scheduling Order dated August 19, 2025, that he intends to pursue the "claims to be asserted in federal court" (as identified in Part IV of his adversarial Complaint) in a separate action before the United States District Court for the Northern District of California. Plaintiff does not seek to litigate those claims within this adversary proceeding and instead requests relief from the automatic stay so that all such federal and related claims may be prosecuted in that non-bankruptcy forum.

## INTRODUCTION

1. This action arises from one of the most reckless and alarming breaches of genetic privacy in American history. Plaintiff Hector Gutierrez entrusted his most intimate and immutable information—his DNA—to Defendant 23andMe, Inc., relying on Defendant's express assurances that his genetic data would remain confidential, secure, and exclusively under Defendant's control. Instead, Defendant Anne Wojcicki, together with 23andMe and its agents, failed to safeguard this data, permitted a catastrophic breach of Plaintiff's genetic

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 3

information, concealed the full scope of the breach (which was likely caused or orchestrated by Anne Wojcicki and 23andMe as part of a deliberate scheme), and then manipulated legal processes to shield themselves from accountability while continuing to retain and monetize Plaintiff's data.

2. In or around October 2023, hackers **gained access to 23andMe's customer data** in a massive security incident. The breach occurred via a credential-stuffing attack (a foreseeable method of attack using stolen passwords), enabled by Defendants' inadequate safeguards. As a result, the personal and genetic information of approximately **6.9 million users** was compromised. The stolen trove included not only names and contact details, but also raw genotype data, health predisposition reports, ancestry profiles, family connections, and other sensitive data uniquely identifying individuals' genetic traits. Among those affected was Plaintiff—who had submitted his DNA sample to 23andMe under the pseudonym "Cecilio Zepedoro" for privacy, before later linking the data to his true identity for purposes of legal redress.

3. The exposure of Plaintiff's Genetic Data has profound and **irreversible consequences**. Unlike a password or credit card number, one's DNA cannot be changed or reissued. **This isn't just data – it's Plaintiff's DNA**. The compromised information could subject Plaintiff to **genetic discrimination,**

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 4

**identity theft, and stigma**, and even invites the specter of bio-surveillance or biological exploitation, and Targeted Biological warfare . Recognizing such dangers, federal law (the Genetic Information Nondiscrimination Act) forbids certain misuse of genetic information – but no law can undo the harm once highly sensitive genetic data is stolen and disseminated. Plaintiff must now live with the **persistent fear and anxiety** that unknown parties worldwide may or likely possess, analyze, or sell the blueprint of his biology.

4. Rather than forthrightly address this breach and its fallout, Defendants—led by 23andMe's co-founder **Anne Wojcicki**—embarked on a calculated campaign to **avoid accountability**. In the immediate aftermath, 23andMe downplayed the severity of the breach and delayed full disclosure of what had occurred, thereby lulling victims (including Plaintiff) into a false sense of security. No meaningful effort was made by Defendants to track down the perpetrators or retrieve the leaked data; nor did any government authority step in to provide answers or restitution. Indeed, while the California Attorney General took the unusual step of publicly urging consumers to delete their 23andMe accounts and genetic data given the company's turmoil, no governmental agency or court ultimately halted Defendants' march toward insulating themselves from liability.

No amount of deletion or steps taken by Plaintiff can ever **eliminate the 23 and Me account or Plaintiff's DNA data already hacked and retained by Anne Wojcicki, TTAM, and others.**

5. In the months following the breach, 23andMe's leadership quietly moved to **extinguish the rights** of Plaintiff and other victims. Multiple putative class action lawsuits were filed against 23andMe, but the company sought to stymie them by invoking an arbitration clause buried in its Terms of Service. (Plaintiff had, presciently, **opted out of arbitration**, preserving his right to bring this suit.) Simultaneously, on information and belief, 23andMe initiated talks to reach a quick, **low-dollar class-action settlement** that would broadly release claims for the data breach. Before any such settlement could face scrutiny, however, Defendants took even more drastic action: in **March 2025, 23andMe filed for Chapter 11 bankruptcy protection**, invoking the authority of the courts to stay all lawsuits and "reorganize" its affairs.

6. Under the shadow of bankruptcy, Defendant Wojcicki orchestrated a scheme to **transfer 23andMe's valuable assets to a new entity under her control**, while shedding liabilities. Wojcicki formed Defendant **TTAM Research Institute** – a nonprofit public benefit corporation created and controlled by her – to serve as the vehicle for this plan. In June 2025, **23andMe obtained court**

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 6

**approval to sell substantially all of its assets, including its entire genetic database and related intellectual property, to TTAM for approximately $305 million**. This price was a mere fraction of the company's prior multi-billion-dollar valuation, reflecting a **fire-sale to an insider**: TTAM was led by 23andMe's own founder (Wojcicki) and funded by interests aligned with her. If consummated, the sale would put Wojcicki back at the helm of the company she co-founded, now cleansed of its debts and legal troubles.

7. The **bankruptcy sale of 23andMe's assets to TTAM** was unprecedented and highly controversial. **Dozens of state Attorneys General – 27 states and the District of Columbia – filed a lawsuit to block the sale**, objecting that customers' genetic data was about to be handed off **"without explicit consent"** to a new owner. As Oregon's Attorney General Dan Rayfield stated, *"People did not submit their personal data to 23andMe thinking their genetic blueprint would later be sold off to the highest bidder."* Despite these grave warnings from state officials, and despite the clear intent of California's Genetic Information Privacy Act (GIPA) to **safeguard consumer genetic data**, Defendants pressed forward and closed the transaction. Plaintiff's Genetic Data, along with that of millions of others, was effectively **sold to TTAM** and placed under

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 7

Wojcicki's control—without so much as an email to Plaintiff seeking his permission.

8. Throughout the restructuring process, Defendants invoked GIPA and other privacy commitments as a shield to deflect criticism and **suppress scrutiny**. They reassured the bankruptcy court and the public that TTAM would honor 23andMe's existing Privacy Policy and GIPA's requirements—while simultaneously violating the **spirit and letter of those protections**. GIPA requires, inter alia, a customer's **separate express consent** for the transfer or disclosure of genetic information to third parties. Yet 23andMe never obtained Plaintiff's affirmative authorization to transfer his Genetic Data to TTAM or any other entity; instead, Defendants took the position that such consent was "implied" by general terms (a much too convenient position) or that users concerned about privacy could simply delete their data if they objected (Plaintiff has discovered that Anne Wojcicki, Defendants, and the unnamed DOES orchestrated terms that unlawfully and deceptively communicate that, even if Plaintiff deletes his account and data with the belief it is permanently removed, Anne Wojcicki, TTAM, and Defendants retain copies in their databases to use at their discretion—adding insult to injury). In essence, Defendants **wrongfully invoked GIPA as a cover**, even as they undermined its core safeguard (user consent) by proceeding unilaterally.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 8

9. By leveraging the **power of state and federal legal processes** in this manner, private Defendants were able to cloak themselves in the **color of law**. They co-opted the machinery of the courts (both the class action device and the bankruptcy system) to achieve what would have been impossible in the open market: the extinguishment of their liability and the unauthorized appropriation of Genetic Data. In doing so, Defendants acted **in active concert with state actors or with the state's imprimatur**. The bankruptcy court's approval, the existence of GIPA, and the lack of intervention by regulators all became tools and circumstances that Defendants exploited to complete their scheme. **This was no ordinary data breach**; it was followed by an extraordinary collusive enterprise wherein private parties and state authority became intertwined to Plaintiff's detriment.

10. As a direct result of Defendants' actions, **Plaintiff's rights have been eviscerated**. He has been stripped of control over his own Genetic Data and denied any meaningful opportunity to seek redress. The corporate shell game orchestrated by Wojcicki means that 23andMe (the company that collected his data and allowed it to be stolen) claims to be insolvent and shielded by bankruptcy, while TTAM (the new holder of his data) claims to have never itself violated any duty to him. Meanwhile, **no one has been held accountable**: to date, Defendants

have faced **no government enforcement penalties, no full accounting of how the breach happened, and no compensation paid to Plaintiff**. Plaintiff is left in a nightmare scenario—his genetic identity is in unknown hands, his privacy breached in perpetuity, and the wrongdoers are profiting from the very data they failed to protect.

11. Plaintiff brings this action to shine a light on Defendants' egregious conduct and to **vindicate his rights under the law**. The facts reveal a pattern of negligence, deception, conversion of personal property, breach of contract and trust, and blatant disregard for constitutional and statutory protections. The centerpiece of this case is Defendants' **conspiracy under color of law** to deprive Plaintiff of his rights—an unlawful agreement between private actors and, on information and belief, certain **government actors** or instrumentalities who enabled the scheme—to obtain, retain, and commercialize Plaintiff's Genetic Data without due process or just compensation. In plain terms, Defendants have **trampled on Plaintiff's civil rights** and privacy in a manner that offends fundamental principles of justice and the Constitution.

12. Through this Complaint, Plaintiff seeks to hold **each Defendant** accountable for their role in this far-reaching wrong. Plaintiff demands **compensatory damages** commensurate with the extraordinary harm suffered;

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 10

**statutory damages and penalties** as provided by law; and **punitive damages** to punish and deter these Defendants for their willful, malicious, and oppressive conduct. Plaintiff further seeks robust **injunctive relief** to finally put a stop to the unauthorized use of his Genetic Data and to require Defendants to implement proper safeguards. Finally, Plaintiff seeks **declaratory relief** that confirms the illegality of Defendants' actions—ensuring that no bankruptcy court order, contract fine-print, or invocation of state law can be misused to extinguish the fundamental rights at stake. In sum, this Complaint serves both as an evidentiary narrative of Defendants' wrongdoing and as a legal indictment of their unprecedented affront to individual genetic privacy and civil rights.

## JURISDICTION AND VENUE

13. **Federal Question Jurisdiction:** This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. Plaintiff asserts violations of federal law, including deprivation of rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution, actionable via 42 U.S.C. § 1983.

14. **Civil Rights Jurisdiction:** This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiff seeks to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution and federal statutes providing for equal rights and protection.

15. **Supplemental Jurisdiction:** Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related state law claims. Those state claims form part of the same case or controversy as the federal claims, as they derive from a common nucleus of operative fact—namely, Defendants' conduct surrounding the breach of Plaintiff's Genetic Data and subsequent conspiracy to misuse that data.

16. **Removal of Jurisdictional Barriers:** To the extent any Defendant is currently a debtor in bankruptcy or claims protection from litigation, Plaintiff has sought and will seek relief from any stay or injunction to permit this action to proceed. No principle of abstention or exclusive jurisdiction bars this Court from adjudicating Plaintiff's claims for non-dischargeable fraud, civil rights violations, and ongoing misconduct that extends beyond the bankruptcy estate.

17. **Venue:** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims

occurred in the Northern District of California. 23andMe, Inc. maintained its principal place of business in this District (Sunnyvale, California), and decisions regarding the data collection, security failures, breach response, and asset transfer were made here. Moreover, Defendants Wojcicki and TTAM Research Institute reside or conduct business in California, and TTAM's operations (continuing 23andMe's business) are centered in this District. Accordingly, venue in this Court is appropriate for the convenience of the parties and witnesses and in the interest of justice.

18. **Intradistrict Assignment:** Pursuant to Civil L.R. 3-2(c)–(d), assignment to either the San Francisco or Oakland Division of this Court is proper because the events in question (including corporate decisions by 23andMe's leadership and the storage of genetic databases) occurred in Santa Clara County, and Defendants 23andMe and TTAM are based in Santa Clara/San Mateo County, which lie within this District's San Francisco/Oakland Division.

## PARTIES

19. **Plaintiff Hector Gutierrez** is a natural person and citizen of California, residing in Inglewood, Los Angeles County, California. Plaintiff is a

U.S. Citizen and consumer of genetic testing services. In or around **October** - 2013, (Plaintiffs account states (**Date Genotyped** October 7, 2013) Plaintiff purchased a DNA test kit from 23andMe and submitted his saliva sample for analysis. To protect his identity, Plaintiff initially created his 23andMe account under a pseudonym ("Cecilio Zepedoro"). Plaintiff later linked the account data to his true identity when pursuing legal recourse for the harms described herein. At all relevant times, Plaintiff expected and understood that his Genetic Data would remain private and secure.

20. **Plaintiff's Relationship with 23andMe:** In providing his DNA and personal information to 23andMe, Plaintiff agreed to certain Terms of Service and Privacy Statements. Plaintiff **relied** on 23andMe's representations that (a) he **"owned" his Genetic Data**, (b) his data would not be disclosed to third parties without consent, (c) he could delete his data or have his biological sample destroyed upon request, and (d) industry-standard security measures protected his information. Plaintiff explicitly **opted out of 23andMe's arbitration clause** and any broad data-sharing research consents, by following the company's procedures to do so. Plaintiff also put 23andMe on notice (via written correspondence) of his intent to pursue legal action if his rights were violated, thereby preserving his ability to seek judicial relief. In sum, Plaintiff placed trust in 23andMe – trust that

was betrayed when Defendants mishandled his Genetic Data and then attempted to

deny him his day in court.

21. **Defendant 23andMe, Inc.** is a Delaware corporation with its

principal place of business in Sunnyvale, California. 23andMe, Inc. is a

biotechnology and personal genomics company that provides direct-to-consumer

DNA testing services. It collects genetic information from millions of individuals

(including Plaintiff), analyzes that data to provide reports on ancestry and health,

and **maintains a proprietary database** of the genetic profiles and accompanying

personal information. At all relevant times, 23andMe, Inc. was responsible for the

storage and security of Plaintiff's Genetic Data. 23andMe, Inc. is a wholly owned

subsidiary of 23andMe Holding Co. (a publicly-traded entity) and was the

operating company that directly interacted with consumers. In March 2025,

23andMe Holding Co. and its subsidiaries (including 23andMe, Inc.) filed

voluntary petitions for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the

Eastern District of Missouri (Case No. 25-40976). 23andMe, Inc. remains a

"debtor-in-possession" in that proceeding, although its key assets have since been

transferred to Defendant TTAM Research Institute as described below.

22. **Defendant TTAM Research Institute** ("TTAM") is a California

nonprofit public benefit corporation with its principal office in California (and

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 15

upon information and belief, operations in or around the San Francisco Bay Area).

TTAM was formed in 2025 and is **controlled and led by Anne Wojcicki**,

23andMe's co-founder. TTAM was specifically created as the vehicle to acquire

23andMe's business during the bankruptcy. In or about June–July 2025, TTAM

acquired substantially all of 23andMe's assets – including the customer Genetic

Data database, related intellectual property, and ongoing business operations –

pursuant to a sale approved by the bankruptcy court. TTAM now operates what is

effectively the 23andMe service under a different name. TTAM has publicly

committed to abide by 23andMe's privacy commitments and to allow customers to

delete their data, but TTAM has also asserted that it **did not assume liability** for

any of 23andMe's past misconduct (including the October 2023 data breach).

TTAM is named as a Defendant herein to ensure that effective relief (especially

injunctive relief) can be awarded, given that TTAM currently holds and controls

Plaintiff's Genetic Data.

23. **Defendant Anne Wojcicki** is an individual residing in California

(Santa Clara or San Mateo County). Wojcicki is the co-founder of 23andMe and

served as its Chief Executive Officer for many years, including throughout the

events at issue (up to and including the 2023 data breach and the 2025 bankruptcy

and sale). Wojcicki is also the founder, board member, and an executive of

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 16

Defendant TTAM Research Institute and many others in this complaint caption .

At all relevant times, Wojcicki was a primary decision-maker who **personally**

**participated in and directed** the wrongful acts alleged in this Complaint. This

includes: failing to implement adequate data security at 23andMe, concealing the

breach, and devising the plan to shift 23andMe's assets into TTAM while avoiding

responsibility to Plaintiff. Wojcicki acted not only as a corporate officer but also in

her individual capacity, **orchestrating a conspiracy** that leveraged both private

and governmental mechanisms to achieve her aims. Plaintiff sues Wojcicki

individually for her tortious conduct and as a **moving force behind the**

**constitutional violations** described herein.

24. **Defendants DOES 1–20** are persons or entities currently

unknown to Plaintiff who participated in, facilitated, or are otherwise responsible

for the wrongful acts and omissions alleged. The true names and capacities of

Does 1–20 are presently unknown, and Plaintiff will amend this Complaint to

allege their true identities when ascertained. On information and belief, Does 1–20

may include corporate officers, employees, contractors, hackers, **governmental**

**actors**, or other collaborators who acted in concert with the named Defendants.

Each Doe Defendant aided and abetted the named Defendants, and/or conspired

with them, in committing the misconduct described, and each is jointly and

severally liable to Plaintiff. Plaintiff's references to "Defendants" in this Complaint shall be deemed to include all named Defendants and Does 1–20.

## FACTUAL ALLEGATIONS

25. **23andMe's Business Model – A Trove of Genetic Data:** 23andMe built its business on collecting and monetizing genetic information. Customers like Plaintiff purchase a kit, submit a saliva DNA sample, and receive personal reports. Behind the scenes, 23andMe amasses one of the world's largest private databases of genetic data. By 2023, over **14 million people** had utilized 23andMe's service, entrusting the company with their DNA sequences and associated health and demographic information. This data is extraordinarily valuable – not just to the individuals themselves, but to researchers, pharmaceutical companies, and potentially malicious actors. 23andMe itself has derived revenue through research partnerships and drug development deals leveraging its database. Indeed, the company's genetic assets were once valued in the billions of dollars. In short, **23andMe knew** it was the custodian of a vast "trove of sensitive consumer data", and it repeatedly acknowledged that privacy and security were paramount to maintaining customers' trust.

26. **Promises of Privacy and Security:** Throughout its marketing and user agreements, 23andMe made prominent assurances to users regarding privacy. The company's Privacy Statements and Terms of Service (to which Plaintiff agreed) promised that: (a) users retain **ownership rights** in their Genetic Data; (b) data would be used only for purposes consented to by the user; (c) personal information would not be shared with third parties (such as employers, insurance companies, or government) without explicit consent or legally valid process; (d) users could **delete their data and have their biological samples destroyed** at any time, pursuant to California's GIPA and the company's internal policy; and (e) robust security measures protected the data (e.g. encryption, secure cloud storage) in accordance with industry standards. These promises created a relationship of **trust and confidence**. Plaintiff reasonably relied on them, believing that by using a pseudonym and following 23andMe's privacy options, his Genetic Data would remain effectively confidential and safe from unauthorized disclosure. Plaintiff has learned that this is not the case and further suspects a deliberate scheme by Defendants, including Anne Wojcicki and other individual actors, to intentionally cause the breach in order to carry out their plan. Defendants effectively devised and executed a sequence of misconduct: first a plan, then a scheme, then a scam, followed by the breach itself, and finally an effort to evade

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 19

accountability through a coordinated bankruptcy strategy. State Attorneys General

intervened with weak and ineffectual lawsuits, which did little to restrain

Defendants. Ultimately, Defendants re-emerged on the other side of the process,

retaining Plaintiff's DNA free of charge, shielded from accountability, and

positioned for unrestricted exploitation—amounting to one of the most prolific

self-enrichment schemes ever perpetrated against Plaintiff by a government-

entangled corporation.

27. **October 2023 Data Breach – "Credential Stuffing" Attack:** On

or about October 1, 2023, news reports and postings on illicit online forums

indicated that a threat actor had obtained data from 23andMe's systems. Initially,

23andMe denied any system breach, suggesting that if data had leaked, it was due

to "credential stuffing" – a tactic where attackers use passwords from other

breaches to access user accounts that share the same credentials This fact raised

Plaintiffs Eye brows. "How did they know exactly the term to use to describe to

the tabloids of how the breach happened?".    In the days that followed, however,

it became clear that a **massive amount of data** was accessed and exfiltrated.

Hackers offered for sale what they claimed was a 23andMe dataset categorized by

genetic ancestry (such as a dataset of people with a particular heritage), implying

deep access to profile information. Ultimately, 23andMe admitted that **millions of**

**customers' data were exposed**. Internal investigation would later reveal that the

attackers likely gained access to **multiple user accounts** (possibly thousands) and

through those, exploited account features (such as relative finder tools or data-

sharing functionalities) to scrape data on a broader set of individuals connected via

genetic relationships. In essence, once inside certain accounts, the attackers were

able to pivot and gather data on many other users. This cascading exploitation

dramatically enlarged the scope of the breach. Defendants 23andMe Anne

Wojcicki and others curiously identified the breach as the result of "credential

stuffing," a highly specific term that suggests they had already investigated and

educated themselves on this method prior to the incident. Plaintiff believes that

when Defendants encouraged users to connect with genetic relatives—such as

cousins, second cousins, and beyond—the groundwork for Defendants' scheme

was already being laid. The timing strongly indicates that the breach was not the

work of independent high-tech hackers intent on selling DNA to foreign

governments, as such hackers would have eventually been exposed and their

efforts rendered futile. Instead, on information and belief, Plaintiff alleges that

Defendants intentionally studied "credential stuffing" as a pretext for the breach

they allowed to occur, positioning it as an excuse in advance. Plaintiff further

alleges that the scheme may have been conceived as early as 2018, coinciding with

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 21

the introduction of familial-connection features by 23andMe, and carried out in

coordination with TTAM, Regeneron, and other presently unknown parties.

28. **Scope of Compromised Information:** The **compromised data**

included everything a malicious actor would need to identify and exploit an

individual. For Plaintiff specifically, the hackers (That includes All Captioned

Defendants themselves) obtained his raw genetic genotype data (the A, C, G, T at

various positions in his genome), which can reveal sensitive health information

(such as predispositions to diseases or carrier status for genetic conditions),

Plaintiff further alleges that Defendants' unlawful possession and exploitation of

his genetic information creates the foreseeable and dangerous possibility of "gain-

of-function" applications, whereby viruses or diseases may be artificially enhanced

or engineered to specifically target Plaintiff's genome and DNA sequence. Such

misuse would result in intentional infection, severe impairment of Plaintiff's

normal bodily functions, or even death. The availability of designer viruses and the

precedent of global misuse, as demonstrated during the coronavirus pandemic,

underscores the plausibility and gravity of this threat. . They also obtained

Plaintiff's personal details provided to 23andMe (such as age, sex, and ethnicity

inference) and potentially his profile name or contact info (which, even though he

used a pseudonym, may have been linked to his real identity through analysis or

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 22

metadata). Plaintiff further alleges that because he disclosed his true identity to 23andMe at the time of enrollment, Defendants can readily and almost instantly identify his genetic information. The filing of this lawsuit only accelerates that certainty, leaving Plaintiff uniquely exposed to misuse, targeting, and exploitation of his DNA by Defendants.. Additionally, because Plaintiff had used 23andMe's service over time, the attackers could have accessed his genealogy connections (family tree matches) and any messages or sharing interactions he had on the platform. **In sum, the breach laid bare Plaintiff's genetic blueprint and contextual data** – information far more intimate and enduring than a credit card number or Social Security number.

29. **23andMe's Failure to Prevent or Limit the Breach:** The breach by purported hackers was **foreseeable and preventable**. 23andMe was on notice that credential stuffing attacks were a known threat (especially after high-profile breaches at similar companies and given the immense value of genetic data). Reasonable security measures – such as requiring two-factor authentication, monitoring for unusual account access patterns, rate-limiting certain account queries, and segregating or limiting data accessible through account features – would have thwarted or at least minimized this attack. However, 23andMe **failed to implement** such measures adequately   For example, even after earlier

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 23

warnings, 23andMe did not universally mandate two-factor authentication for accounts, nor did it sufficiently cap the volume of data one account (or a network of connected accounts) could retrieve. Furthermore, 23andMe's systems apparently did not timely detect the unusual data aggregation occurring. **This lax approach** stands in stark contrast to industry best practices and violated 23andMe's own commitments to use "industry-standard security practices". Defendant Wojcicki and other executives were aware (or should have been aware) of these deficiencies but failed to act, prioritizing user convenience and growth over security. .

( Nevertheless **Plaintiff believes, on information and belief, that Defendants— principally Anne Wojcicki and her affiliated entities—engaged in a deliberate course of conduct both before and after the breach, including actions taken through related bankruptcy proceedings, to permit and facilitate the breach. Plaintiff alleges that this orchestrated failure enabled the creation of TTAM, with Anne Wojcicki as CEO, for the express purpose of repurchasing and reclaiming Plaintiff's DNA data without restriction, thereby exercising dominion and control over Plaintiff in a manner akin to ownership, reducing Plaintiff to the status of property rather than a free individual**.)

      30. **Delayed Disclosure and Concealment:** When the breach came to light, 23andMe's response was marked by **evasion and concealment**. The

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 24

company was slow to provide direct notice to affected individuals, including

Plaintiff. Plaintiff received **no immediate personal notification** in early October

2023 when news of the hack surfaced; instead, 23andMe issued a generic blog post

and waited weeks before sending out confirmation emails to users. During that

period, 23andMe publicly characterized the incident in minimizing terms –

implying that because it was "just" credential stuffing, the fault lay with users

reusing passwords, and that only a small subset of accounts were "targeted." These

statements were **misleading omissions**. They omitted the crucial fact that even

customers with strong unique passwords (like Plaintiff) were impacted due to the

systemic nature of the data scraping. 23andMe did not initially reveal the true

number of affected users or the breadth of data types taken. It was only after

pressure mounted (including inquiries from journalists and affected customers) that

23andMe eventually acknowledged the scope (millions of users). By then, the

stolen data had been circulating on the dark web for some time. In sum, 23andMe

**breached its duty of candor** by concealing material facts about the breach's true

nature and extent, depriving Plaintiff of the opportunity to take timely protective

measures (such as changing account settings, informing relatives, or pursuing legal

action before Defendants' corporate maneuvers unfolded).

31. **Emotional and Dignitary Impact on Plaintiff:** Plaintiff was devastated to learn that his Genetic Data was compromised.        As an informed and engaged citizen, a former nursing student and assistant, and a vigilant individual who directly experienced the impact of the COVID-19 pandemic, Plaintiff is acutely aware of the grave risks posed when personal data is misused by bad actors. The realization that his DNA – the very essence of his identity – was now out of his complete and total control has caused him and continues to cause to suffer severe anxiety, stress, depression, anger, disbelief, grief, fear, shock, humiliation, embarrassment, loss of enjoyment of life, pursuit of happiness, insomnia, panic attacks, shame, symptoms consistent with post-traumatic stress disorder, hopelessness, helplessness, cognitive impairment including difficulty concentrating and memory loss, social withdrawal and isolation, as well as physical manifestations of emotional harm including headaches, chest pain, severe fatigue, amongst other things. Plaintiff became deeply concerned about potential **genetic discrimination**, noting that while laws like GINA prohibit some uses (employment, health insurance), they do not cover life insurance or long-term care insurance, enemy state actors, bio weapons manufacturers, foreign governments, the purported hackers which continuously and consistently leave plaintiff vulnerable until Anne Wojcicki and the Defendants get Plaintiffs DNA data

returned to Plaintiff from all Hackers, Foreign governments, third parties lastly the Defendants themselves namely TTAM and Defendant Anne Wojcicki leaving him vulnerable when his genetic predispositions are revealed. Plaintiff also feared **unwarranted surveillance or profiling**, since genetic data could be used to identify him or his relatives in databases (for instance, by unlawful law enforcement, law enforcement, Government actors, Corporations, Insurance companies or others using genealogy techniques xx Plaintiff further alleges that disclosure of his genetic ancestry creates a foreseeable risk that **terrorists, hostile actors, or terrorist-aligned governments** could exploit such information to target, harass, or harm him. Specifically, because Plaintiff's ancestry includes historically persecuted populations—such as Ashkenazi Jewish heritage—this information could be used to justify attacks or assassination based on historical prejudices or animosities. The modern availability of Plaintiff's DNA, combined with detailed genealogical data, substantially increases the risk of targeted physical, economic, or social harm.

The breach inflicted not only economic harm (diminution of the value of his data and services paid for) but also a profound **violation of privacy and personhood**. Plaintiff experienced trouble sleeping, persistent anger, disbelief, anxiety, and a significant loss of trust in institutions that are supposed to protect

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 27

personal information. "Plaintiff's emotional injuries were directly and proximately caused by Defendants' conduct, and constitute the foreseeable and natural consequence of Defendants' deliberate acts, omissions, and failures as alleged herein."

32. **Defendants' Post-Breach Scheme to Avoid Liability:** Shortly after the breach, Defendant Wojcicki and 23andMe's board formulated a plan that was as Machiavellian as it was swift. Internal communications (the details of which will be further revealed in discovery) indicate that Defendants were gravely concerned about the potential legal exposure – from class action damages that could total in the billions (given statutes like California's Customer Records Act and CCPA) to regulatory penalties and the incalculable damage to 23andMe's reputation. Rather than dedicate their efforts to compensating victims and tightening security, Defendants chose to **invoke every tool at their disposal to shield themselves**. This included: pushing for a quick settlement with class representatives for pennies on the dollar (to bind absent class members before they could object), inserting broad releases into any such settlement, and then using a bankruptcy filing to stay all other lawsuits and channel remaining liabilities into a forum where they could be contained or discharged.

33. **March 2025 – Bankruptcy Filing:** On March 29, 2025, 23andMe Holding Co. and its affiliates filed for Chapter 11 bankruptcy. In doing so, 23andMe publicly cited financial distress and legal pressures, but Plaintiff alleges that the timing and context show the bankruptcy was a **litigation tactic** as much as a business necessity. By filing bankruptcy, 23andMe obtained the **automatic stay** of 11 U.S.C. § 362, which immediately halted all ongoing litigation, including any class actions or individual suits arising from the breach. It also allowed 23andMe to propose a plan to deal with liabilities collectively. Notably, while under bankruptcy protection, 23andMe did **not** prioritize any thorough investigation of the breach or improvement of data security – instead, it focused on cutting costs and finding a buyer for its assets. They did in Anne Wojcicki. Plaintiff, who at that time was preparing legal action under the federal two tear statute of limitations for Personal Injury and 42 USC 1983, found his path to relief abruptly blocked by the bankruptcy stay.

34. **Formation of TTAM and Insider Bid:** In April–May 2025, as 23andMe's bankruptcy progressed, Defendant Wojcicki founded **TTAM Research Institute**. TTAM was ostensibly a nonprofit aimed at continuing 23andMe's mission of genetic research and services. However, in reality TTAM served as a **continuation of 23andMe under a different guise**. Wojcicki and a select group of

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 29

insiders (possibly including other executives or friendly investors) positioned TTAM to make a **stalking horse bid** for 23andMe's assets. Initially, a different buyer (a third-party pharmaceutical company, e.g. Regeneron) was lined up to purchase 23andMe. But Wojcicki leveraged her influence and knowledge of the company to outmaneuver that bid or what appeared to be an outmaneuver of that bid. In an unusual move, the bankruptcy judge **reopened the bidding** to allow TTAM's offer, which proved successful. This raised eyebrows because it indicated special accommodation for an insider-controlled entity. "Plaintiff alleges that Defendant Wojcicki's influence—including assurances concerning continued California operations and purported privacy protections—improperly swayed the proceedings, resulting in the Bankruptcy Court's approval of a collusive 'sweetheart deal' that effectively intertwined governmental authority with Wojcicki's private interests.".

35. **July 2025 – Sale Approval Despite Objections:** On July 1, 2025, the Bankruptcy Court approved the sale of 23andMe's business to TTAM. This occurred **despite active objections from a coalition of state Attorneys General** and consumer advocates. Those objectors argued that transferring highly sensitive Genetic Data without each customer's informed consent would violate privacy laws and fundamental rights. California's Attorney General, for example, pointed

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 30

to GIPA's protections and urged that customers be given the chance to opt out of any transfer (or have their data deleted) before a sale. The court nevertheless authorized the sale, relying in part on TTAM's promises to honor privacy commitments. Plaintiff is adamant that Defendant Wojcicki and the other Defendants have never honored their professed privacy commitments, which were impossible to fulfill from the outset. How the Court accepted such representations remains a matter for discovery. In reality, Plaintiff's genetic data exists in copies beyond Plaintiff's control, and Defendants—including Wojcicki and TTAM—are fully aware of this fact. Certain Defendants have already been rebuked before Congress for disclosing in their revised Terms of Service that, even if Plaintiff deletes his account and associated data, TTAM and others will nonetheless retain a copy. This admission renders any promise of deletion illusory, effectively nullifies the Court's reliance on those assurances, and constitutes a breach of the representations made to the Court. The understanding is that Defendants still own plaintiff and his DNA and no matter what Plaintiff can never get it back. The sale order (on information and belief) did not explicitly require TTAM to obtain fresh consents from individuals, nor did it guarantee any compensation or new rights to the individuals whose data was being sold. In essence, the **state's interest in protecting genetic privacy was subordinated to the bankruptcy process**.

Plaintiff contends that this was a critical turning point where state power (through the court's authority) was enlisted, however unwittingly, in Defendants' plan: the sale order gave a judicial stamp of approval to the **transfer of Plaintiff's property (Genetic Data) to a new owner without his consent**.

36. **Seamless Continuation Under a New Name:** After the sale, TTAM began operating what is effectively 23andMe's service. The same laboratories, databases, and websites continued to be used, but under TTAM's ownership. To consumers, little appeared to change: they could still log into the same accounts and access the same genetic reports. Wojcicki released public statements expressing she was "thrilled" that TTAM would carry on 23andMe's mission and emphasizing "choice and transparency" for individuals with respect to their genetic data. These platitudes rang hollow to Plaintiff. In reality, **the same individuals who had presided over the breach were now continuing to profit from the data**, only shielded by a new corporate structure. TTAM did not reach out to Plaintiff to renew consent for his data usage; it simply stepped into 23andMe's shoes and asserted ownership and control over the Genetic Data. Internally, TTAM (and Wojcicki) took the position that any user who didn't wish their data to be held by TTAM could delete their account – a "take it or leave it" approach that ignored the fact that **Plaintiff's data was already stolen and**

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 32

**circulating**. Deleting his account at that stage would do nothing to put the genie back in the bottle, and would only cut Plaintiff off from information about his own genetic profile that TTAM continues possess, use, profit from andto analyze.

37. **Retention of Benefits, Denial of Liabilities:** By August 2025, Defendants' plan had fully materialized. TTAM had **acquired all of 23andMe's valuable assets** (including databases, lab equipment, brand rights, and ongoing customer relationships) but pointed to the bankruptcy to deny responsibility for the breach that occurred pre-sale. 23andMe, Inc., now an effectively defunct shell in bankruptcy, would claim any legal claims for damages were stayed or discharged. This one-two punch left Plaintiff ostensibly with **no remedy**: the wrongdoer says "I have no money – I'm bankrupt," while the successor says "I have the data – but I didn't cause the breach." This outcome was engineered by Defendants and is unjust, illegal, and damaging. Plaintiff alleges that the **transfer to TTAM was a fraudulent and unlawful conveyance** insofar as it aimed to leave no effective recourse for those injured by 23andMe's misconduct. The transaction was not an arms-length business necessity; it was a device to **preserve the wealth generated from the Genetic Data while escaping the consequences of abusing that data**.

38. **Ongoing Use and Monetization of Plaintiff's Data:** TTAM, under Wojcicki's leadership, continues to possess and potentially use Plaintiff's

Genetic Data to this day. Every indication is that TTAM will continue the same lines of business – including research collaborations, drug development, and possibly new data-sharing initiatives – that make use of the database containing Plaintiff's DNA. Plaintiff never consented to TTAM using his Genetic Data; in fact, he never even had an opportunity to provide or withhold such consent because the transfer happened without direct notice to him. Thus, each day that Plaintiff's Genetic Data resides in TTAM's servers and is accessed or used by Defendants is an **ongoing injury and unauthorized taking**. Plaintiff has a right to the return or deletion of his Genetic Data and to ensure it is not further exploited, but absent court intervention, Defendants have shown no inclination to respect that right whatsoever. TTAM's stance has been that it "complied with 23andMe's privacy policy" during the transition, which in Defendants' view was enough – a view that Plaintiff strongly contests as being contrary to GIPA and basic rights and privacy principles.

39. **Conspiracy and Collaboration with State Actors:** Plaintiff alleges that the wrongful acts described were not conducted by private defendants in isolation; rather, they were achieved through **collusion and significant assistance from state instruments**. This conspiracy manifested in several ways:

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 34

a. **Abuse of Legal Process:** Defendants collaborated in invoking the **state's legal mechanisms (courts and laws)** to execute their plan. The use of the class action settlement process (requiring court approval), the bankruptcy stay and sale (requiring court orders), and even the invocation of GIPA (a state statute) as a shield, all involved **active participation by state actors** (judges approving motions, etc.). Defendants knew that by securing favorable rulings or inaction from these state actors, their private scheme would carry the color of legitimacy. Wojcicki and those acting at her direction sought to **influence these outcomes** – for example, by making representations to the bankruptcy court that minimized privacy concerns and by structuring the sale to appear in the public interest (via a nonprofit), thus enlisting the court's power in service of their goals.

b. **Suppression of Scrutiny:** On information and belief, Defendants also **coordinated with certain government officials or insiders** to limit regulatory pushback. While many Attorneys General fought the sale, Plaintiff is investigating whether any state officials may have acquiesced or assisted Defendants behind the scenes. It is notable that no federal agency (such as the FTC or HHS) took public enforcement action against 23andMe in the wake of the breach or sale, despite the obvious privacy implications. Plaintiff alleges that Defendants leveraged their influence (through lobbying or political channels) to

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 35

**discourage or delay regulatory intervention**, effectively muting the government's response aside from the aforementioned consumer alert. If any government personnel (who are presently unidentified Does) conspired in this effort by sharing insider information or by ensuring a light-touch regulatory approach, they became part of the conspiracy.

c. **GIPA Misuse:** The **Genetic Information Privacy Act (Cal. Civ. Code § 56.17, et seq.)** was intended to protect consumers, but Defendants turned it into a sword against consumers' interests. Specifically, Defendants invoked GIPA's provisions (which give consumers the right to delete data or revoke consent) as a way to argue that *individuals, not the company,* bore responsibility to protect themselves post-breach. By publicly saying, in effect, "customers can delete their data if they're concerned," Defendants shifted blame and deterred deeper scrutiny into how the data was being handled. This narrative was parroted in public statements and, upon information and belief, in communications with state officials. Such **wrongful invocation of GIPA** gave a false impression that the situation was under control and that compliance with the law was in order, when in truth Defendants were violating GIPA by not obtaining explicit consents for the data transfer and by not adequately safeguarding data in the first place.

40. **Plaintiff's Damages and the Need for Relief:** Plaintiff has suffered and continues to suffer severe damages as a result of the foregoing events. These damages include, but are not limited to: (a) the loss of the economic value of his Genetic Data (which companies trade for substantial sums) and the loss of the benefit of his bargain with 23andMe (he paid for a service that was supposed to include data protection and privacy); (b) significant **emotional distress** (as detailed above, including anxiety, depression, and trauma from the knowledge that his genetic identity is forever compromised); (c) the **invasion of his privacy** and violation of his personal autonomy, which are injuries recognized in law as compensable even absent pecuniary loss; (d) **exposure to future risk** (he must now monitor genetic forums, consider additional identity theft protection, and live with the heightened risk of unknown parties exploiting his DNA data in unforeseeable ways); and (e) the **costs of mitigation**, which may include medical privacy measures, genetic counseling, and legal expenses to protect his rights. The full measure of Plaintiff's damages will be proven at trial, but they are certainly well in excess of the jurisdictional minimum of this Court and, given the unique nature of genetic harm, warrant **substantial awards** to achieve restitution and deterrence. Moreover, Defendants' conduct was willful, malicious, and in

ADV. PROC. NO. 25-04043-357 AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 37

conscious disregard of Plaintiff's rights, justifying the imposition of **punitive damages** in an amount sufficient to punish and deter such conduct.

41. **Continuing Irreparable Harm:** Monetary relief alone is not sufficient to make Plaintiff whole. **Injunctive relief** is critically needed to address the ongoing misuse of Plaintiff's Genetic Data. Without court orders, Defendants are free to continue retaining and potentially exploiting Plaintiff's DNA information. Each day that passes is another day his privacy is violated anew. Plaintiff seeks injunctive orders requiring Defendants to delete any and all of his Genetic Data in their possession, and to cease any use or sharing of it. Additionally, **declaratory relief** is needed to clarify the parties' rights and obligations – for example, a declaration that Plaintiff maintains an ownership or property interest in his Genetic Data and that the bankruptcy sale did not extinguish his personal rights. Such declarations will guide and justify the injunctive relief and ensure that Defendants and any successors are bound to respect Plaintiff's personal data rights going forward.

42. **Exhaustion of Remedies / Lack of Alternatives:** Plaintiff has no adequate remedy at law for the wrongs described herein. He attempted to protect himself by opting out of arbitration and promptly objecting to any unauthorized uses, but Defendants' convoluted legal maneuvers outpaced the normal channels of

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 38

redress. The bankruptcy proceedings have not provided, and likely will not provide, any compensation or relief to individual breach victims like Plaintiff (indeed, 23andMe's reorganization plan, if approved, threatens to extinguish such claims entirely). Plaintiff's only recourse is this lawsuit, which ties together the full scope of Defendants' wrongdoing across both state and private action. Justice demands that this Court allow Plaintiff to pursue these claims to cut through the corporate machinations and hold Defendants accountable on the merits.

43. All conditions precedent to the filing of this action have been performed, have occurred, or have been excused. Plaintiff accordingly proceeds to set forth his causes of action. Each of the following causes of action re-alleges and incorporates all preceding paragraphs as though fully set forth therein.

_____

"Plaintiff reiterates that the following causes of action are not being adjudicated in this adversary proceeding; they are listed here for reference but will be asserted in the U.S. District Court for the Northern District of California in a separate lawsuit, upon obtaining relief from the automatic stay to proceed in that forum".

# FIRST CAUSE OF ACTION

## Negligence

*(Against All Defendants)*

44. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 43 as though fully set forth herein.

45. **Duty:** Defendants owed Plaintiff a legal duty to exercise reasonable care in the collection, maintenance, and protection of his personal and Genetic Data. This duty arose from multiple sources, including: the special relationship created by 23andMe's service (entrusting Defendants with sensitive personal property and information); explicit promises made in privacy policies and terms (to safeguard data); and statutory mandates such as California Civil Code § 1798.81.5 (requiring businesses to implement reasonable security measures for personal information) and GIPA (requiring strict confidentiality of genetic data). Defendants further undertook a duty by holding themselves out as a secure platform and by actively assuring users like Plaintiff that their data would remain private and safe. Once the foreseeable risk of harm (data breach and misuse) arose, Defendants had a duty to promptly notify and protect Plaintiff.

46. **Breach of Duty:** Defendants breached their duties of care through acts and omissions that fell below the standard of a reasonably prudent data custodian. Specific breaches include, but are not limited to: (a) **failure to implement reasonable cybersecurity measures** (such as robust authentication, intrusion detection, data encryption at rest, and account access limits) to prevent unauthorized access to Plaintiff's data; (b) **failure to comply with industry standards and regulatory guidance** on data protection, despite awareness of the highly sensitive nature of genetic information; (c) **negligently allowing known vulnerabilities** (like the risk of credential stuffing) to persist without mitigation, even after prior security incidents and warnings; (d) **failure to timely detect and stop the breach** when it began (allowing attackers to exfiltrate data over an extended period); (e) **negligent misrepresentation and concealment** after the breach, which prevented Plaintiff from taking mitigating actions; and (f) **improperly handling Plaintiff's data after the breach** by transferring it to TTAM without safeguards or consent, thereby prolonging the period of risk. Each of these acts and omissions was a breach of Defendants' duty to act with the care that a reasonable entity in their position would have exercised.

47. **Actual and Proximate Causation:** Defendants' negligence was the actual and proximate cause of Plaintiff's injuries. But for Defendants' failure to

secure the data, Plaintiff's Genetic Data would not have been stolen by unauthorized parties. But for Defendants' failure to disclose and respond properly, Plaintiff could have taken steps to protect himself sooner. And but for Defendants' decision to sell the data to TTAM without safeguards, Plaintiff's information would not now be in indefinite limbo. The harm to Plaintiff was eminently foreseeable: given the sensitive nature of DNA information, any breach of security or mishandling was likely to result in exactly the kind of privacy invasion and emotional distress that occurred. No superseding or unforeseeable cause intervened to break the chain of causation; to the contrary, every step of harm flowed directly from Defendants' conduct. Plaintiff did nothing to contribute to his injuries—he had no control over Defendants' systems or decisions.

48. **Damages:** As a direct and legal result of Defendants' negligence, Plaintiff has sustained substantial damages, in an amount to be proven at trial but not less than $500,000,000,000.00.    Plaintiff has suffered economic damages, including but not limited to: (a) the loss of the economic value inherent in his genetic data; (b) the loss of the benefit of a service that was contractually and expressly represented to include data protection; and (c) the expenditure of significant time, resources, and years of life in litigating this action as a direct consequence of Defendants' misconduct."

ADV. PROC. NO. 25-04043-357 AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 42

Non-Economic Damages

"Plaintiff has also suffered non-economic damages, including but not limited to:
(a) severe emotional distress, mental anguish, pain and suffering, and continuing
psychological harm; (b) the loss of privacy, dignity, and peace of mind; and (c) the
infringement of fundamental constitutional rights, including the rights to life,
liberty, the pursuit of happiness, and to petition the government for redress of
grievances—rights that are directly threatened and undermined by Defendants'
fraudulent scheme.

Plaintiff's emotional anguish is ongoing and manifested by anxiety,
stress, and concern for his and his family's futures. Plaintiff also faces **increased
future costs** to his person as stated above and is attributable to the increased risk
directly and proximately cause by Anne Wojcicki and the Defendants data breach
and bankruptcy scheme. The magnitude of the data involved (genetic information
of enduring relevance) means Plaintiff's damages will continue to accrue into the
future, as the information cannot be made private again. Furthermore, the law
recognizes that the **loss of privacy itself is a harm** for which damages are
recoverable.

49. **Gross Negligence / Recklessness:** To the extent necessary,
Plaintiff alleges that Defendants' conduct constitutes **gross negligence** – an

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 43

extreme departure from the ordinary standard of care. Defendants were well aware of the grave risks (they knew the unique sensitivity and value of genetic data) and yet exhibited a wanton disregard for the consequences. Such reckless indifference (for example, ignoring clear security deficiencies and then misusing the legal system to bury the problem) justifies an award of **punitive damages** in addition to compensatory damages, to punish Defendants and deter similar conduct.

   **WHEREFORE,** Plaintiff prays for judgment in his favor on this cause of action, and requests an award of **compensatory damages** in an amount to fully compensate his losses, **punitive damages** (given Defendants' gross negligence and willful disregard of rights), and **such further relief** as the Court deems just and proper, including costs of suit but not less than $500,000,000,000.00. Plaintiff also seeks appropriate **injunctive relief** to require Defendants to implement proper data security and to prevent the continued misuse of his Genetic Data and to be alerted within a days' time of such misuse of his genetic data.

_____

## SECOND CAUSE OF ACTION

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 44

## Gross Negligence

### *(Against All Defendants)*

50. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 49 as though fully set forth herein.

51. As described above, Defendants breached their duties to Plaintiff in a manner that goes beyond ordinary negligence and rises to the level of **gross negligence**. Defendants' conduct was so egregious that it demonstrated a **conscious, voluntary disregard of the need to use reasonable care** and a heedless indifference to the consequences affecting Plaintiff.

52. **Particulars of Gross Negligence:** Defendants were aware of the high likelihood that serious harm would result from their actions and omissions. Specifically, Defendants: (a) **knew** that genetic data, if compromised, would cause irreversible harm to individuals and that their data systems were inadequately protected, yet chose to not invest in or implement readily available safeguards; (b) **knew** that failing to promptly notify and be transparent about the breach would compound the harm by leaving victims uninformed, yet they deliberately delayed and obfuscated; and (c) **knew** that transferring assets (including data) in the midst of an unresolved breach without user consent would violate fundamental privacy

rights, yet they proceeded for their own advantage. This level of knowledge and the decision to proceed anyway constitute more than mere carelessness – it is **wanton and reckless misconduct**.

53. Defendants' gross negligence was a substantial factor in causing Plaintiff's injuries. The reckless decisions and actions described directly led to the exposure of Plaintiff's Genetic Data and the ensuing damages. Unlike a mere inadvertent error, these were **decisions made with full appreciation of the danger**, thus satisfying the standard for gross negligence.

54. Plaintiff's damages resulting from Defendants' gross negligence include all those detailed previously (economic and non-economic harm), and they were exacerbated by Defendants' recklessness. For example, had Defendants exercised even slight care (e.g., a timely breach notification or meaningful post-breach support), some of Plaintiff's distress could have been mitigated. Instead, Defendants' callous inaction and self-interested maneuvers significantly worsened Plaintiff's situation.

55. In view of Defendants' gross negligence, Plaintiff seeks not only compensatory damages but also, as permitted by law, **punitive damages**. Defendants acted with such indifference to Plaintiff's rights and safety that an

example needs to be made to deter them and others from similar conduct. Punitive damages are justified to the extent Defendants' behavior is found to be malicious, oppressive, or in reckless disregard of Plaintiff's rights.

**WHEREFORE,** Plaintiff prays for judgment in his favor on this cause of action of not less than $500,000,000,000.00, including an award of all **compensatory damages** proximately caused by Defendants' gross negligence, as well as **punitive damages** sufficient to punish Defendants and deter such egregious conduct in the future of not less than $ 500,000,000,000.00. Plaintiff also seeks **costs of suit** and any further relief deemed just and proper by the Court.

_____

## THIRD CAUSE OF ACTION

### Breach of Contract

*(Against 23andMe, Inc.)*

56. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 55 as though fully set forth herein.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 47

57. **Existence of Contract:** Plaintiff and Defendant 23andMe, Inc. entered into a binding contract governing the provision of genetic testing services and the handling of Plaintiff's Genetic Data. The terms of this contract are reflected in 23andMe's Terms of Service and Privacy Policy (as agreed to by Plaintiff), as well as any additional representations made by 23andMe at the time of Plaintiff's purchase and use of the service. Plaintiff performed his obligations under the contract by paying the required fees and providing a DNA sample, and by complying with the terms (e.g., using the service for personal purposes and not breaching any user rules).

58. **Contractual Promises:** Under the contract, 23andMe made numerous material promises to Plaintiff, including: (a) **Privacy and Security Promises** – that Plaintiff's personal information and Genetic Data would be kept confidential and secure, and used only in accordance with Plaintiff's consent choices; (b) **Data Ownership and Control** – that Plaintiff would retain ownership of his Genetic Data and could download or delete it at will, and that 23andMe would honor requests to delete data or destroy remaining biological samples; (c) **No Unauthorized Disclosure** – that 23andMe and Defendants would not disclose or share Plaintiff's data with third parties (other than as allowed by Plaintiff, such as optional research participation which Plaintiff declined) unless required by law

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 48

or valid legal process; (d) **Product and Service Quality** – implicit in the contract was that 23andMe's service would be performed with reasonable care and skill, including safeguarding data (this is also sometimes expressed as an implied covenant or warranty, but it is part of what Plaintiff bargained for); and (e) **Compliance with Applicable Laws** – 23andMe implicitly and explicitly promised to comply with privacy laws like GIPA and consumer protection statutes, which by extension was part of the contractual expectation of lawfulness. No such evidence support compliance namely in light of the Bankruptcy proceedings and subsequent and current acts and efforts by Defendants.

59. **Breach of Contract:** 23andMe, Inc. and Defendants materially breached the contract with Plaintiff through the following non-exhaustive acts:

- **Security Breach (Privacy/Security Promise Breach):** By failing to maintain adequate security and thereby allowing unauthorized access to Plaintiff's Genetic Data, 23andMe breached the promise that it would keep Plaintiff's data secure and confidential. The contract's core guarantee of privacy was shattered by the data breach, which constitutes a fundamental failure of consideration.

- **Unauthorized Transfer of Data (No-Disclosure Promise Breach):** By transferring Plaintiff's Genetic Data to TTAM (a separate entity) without obtaining Plaintiff's consent, 23andMe and Defendants breached the contractual promise not to disclose data to third parties without permission. The sale to TTAM was not a disclosure "required by law" (indeed it was done for business convenience) and Plaintiff was never consulted or given an opportunity to opt out beyond the theoretical ability to delete his account (which is not equivalent to informed consent for transfer).

- **Failure to Allow Meaningful Control (Ownership/Control Breach):** Although Plaintiff had the right on paper to delete his data, 23andMe's actions rendered that right illusory. By concealing the breach's extent, Plaintiff was delayed in exercising deletion or other control options. Moreover, once Plaintiff's data was stolen, 23andMe no longer had exclusive possession to effectuate any deletion meaningfully. Thus, 23andMe and Defendants breached its contractual duty by undermining Plaintiff's ability to control his own data as promised.

- **Good Faith and Fair Dealing (addressed more fully in the next cause of action):** 23andMe's and Defendants maneuvers to offload assets to TTAM and seek releases via class action and bankruptcy effectively deprived

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 50

Plaintiff of the benefit of the contract (the benefit being a secure genetic service). While these aspects are covered under the implied covenant, they also represent breaches of the spirit of the contractual relationship.

60. **Damages from Breach:** Plaintiff sustained damages as a direct result of 23andMe's contract breaches. Had 23andMe honored its promises, Plaintiff's Genetic Data would not have been stolen or sold, and his privacy and peace of mind would remain intact. The **value of the service** Plaintiff paid for included data security and privacy—features which were not provided, rendering the service he received worth far less (if not worthless or even harmful). Plaintiff effectively paid for a product that, by breaching, caused him harm. Thus, Plaintiff suffered **expectation damages** equal to the difference in value between the secure, private service he was promised and the compromised, injurious service he got, as well as **consequential damages** in the form of losses flowing from the breach (emotional distress and other harms, which are recoverable here because the contract was inherently tied to matters of privacy and emotional well-being, and breach of such a contract was particularly likely to cause serious emotional disturbance). Additionally, Plaintiff lost the **property value of his Genetic Data** which 23andMe treated as a monetizable asset for itself rather than protecting it for

Plaintiff's benefit. The damages are ongoing, since TTAM's possession of the data continues to deprive Plaintiff of control and benefit.

61. Plaintiff has performed all conditions, covenants, and promises required on his part by the contract, or such conditions were waived or excused by 23andMe's and Defendants conduct. There is no legitimate defense for 23andMe's and Defendants breaches: any limitation of liability or arbitration clause is unenforceable here (Plaintiff opted out of arbitration, and any liability cap cannot shield intentional or reckless breaches of privacy given considerations of equity and public policy).

62. **Successor Liability:** To the extent 23andMe, Inc. and Defendants claims inability to respond in damages due to bankruptcy, Plaintiff alleges that TTAM as the successor and alter ego may be held liable for the contract breaches as well. TTAM knew it was acquiring the data subject to user agreements and privacy commitments. If TTAM wishes to enjoy the benefits of those contracts (the data and customer base), it cannot disclaim the accompanying burdens. In any event, Plaintiff seeks full recovery from 23andMe, Inc. and Defendants (and its estate and insurers) for the contractual breaches, and leaves for later proceedings the allocation of responsibility between 23andMe and TTAM.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 52

**WHEREFORE,** Plaintiff prays for judgment in his favor on this cause of action. He seeks no less than $ 500,000,000,000.00 and **contract damages** sufficient to put him in the position he would have been in had the contract been fully performed (including the refund of monies paid and compensation for loss of the promised privacy/security), as well as consequential damages that were foreseeable at the time of contracting (including emotional harm given the nature of the contract). Plaintiff also seeks **restitutionary disgorgement** of any benefits unjustly obtained by Defendants through use of his data contrary to contract. Additionally, Plaintiff requests **declaratory relief** establishing that any purported limitation of liability in the contract is void and that Plaintiff's data must be returned or deleted. Plaintiff asks for **costs of suit, pre- and post-judgment interest, and any further relief** the Court deems just.

---

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

*(Against 23andMe, Inc.)*

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 53

63. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as though fully set forth herein.

64. Every contract in California includes an implied covenant of **good faith and fair dealing**, which requires that neither party do anything to unfairly interfere with the right of the other to receive the benefits of the contract. In the context of Plaintiff's contract with 23andMe, this meant that 23andMe would act in good faith to protect Plaintiff's interests in privacy and data security, and would not subvert the contract's purpose or Plaintiff's rights under it.

65. **Unfair Interference with Contractual Benefits:** 23andMe, Inc., through the conduct of its principals (including Defendant Wojcicki), breached the implied covenant by engaging in bad-faith actions that destroyed or injured Plaintiff's right to receive the fruits of the contract. Specifically, after collecting Plaintiff's Genetic Data under promises of privacy, 23andMe **abused the contractual relationship** by: (a) **concealing the breach and its severity** to avoid triggering Plaintiff's contract rights (e.g., his right to delete data or seek remedies); (b) **manipulating legal processes (class action, bankruptcy)** to preempt Plaintiff from enforcing the contract or obtaining its benefits (like data deletion or compensation for the service failure); and (c) **transferring assets (including Plaintiff's data) to TTAM** in a manner that attempted to cut off Plaintiff's

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 54

contract-based claims entirely. These actions were taken in bad faith, motivated by a desire to evade liability and maximize Defendants' own gain, rather than to fulfill contractual obligations.

66. **Examples of Covenant Breach:** One concrete example is that 23andMe's Terms of Service and Privacy Policy implicitly contemplated that user data would remain protected and within the custody of the company unless certain conditions (like lawful access requests or user consent) applied. By selling the data to TTAM without adhering to those conditions, 23andMe acted to **deprive Plaintiff of the privacy protection benefit** of the contract. Another example: the contract's dispute resolution and governing law provisions assumed good faith – instead, 23andMe filed bankruptcy in another state (Missouri) to make it harder for users like Plaintiff to pursue claims, a tactic that, while legally available, can be viewed as bad faith in the context of their obligations to users. In sum, 23andMe sought to enjoy the contract's benefits (use of Plaintiff's data, revenue from him and others) while skirting its burdens, thereby violating the **spirit of mutual fair dealing**.

67. As a direct and proximate result of 23andMe's breach of the implied covenant, Plaintiff suffered the contract damages previously described. In particular, Plaintiff was denied the **benefit of his bargain** – he got a compromised,

harmful service instead of a secure and privacy-respecting service. Additionally,

Plaintiff had to incur legal expenses and endure delays due to Defendants' bad-

faith maneuvers (for instance, the time and effort required to lift the bankruptcy

stay and litigate these issues is itself a harm flowing from the breach of the

covenant).

68. **Independent Wrong and Malice:** 23andMe's breach of the

implied covenant was **accompanied by malice, oppression, or fraud**, as

evidenced by the intentional and conspiratorial nature of its actions. Therefore, in

addition to contract remedies, Plaintiff seeks, to the extent permitted by law, **tort**

**damages for bad faith** and/or exemplary damages. While punitive damages are

generally not available for pure contract breaches, the conduct here overlaps

significantly with tortious behavior (fraudulent concealment, etc.) which is

separately pleaded; thus, Plaintiff reserves the right to seek such damages under

those tort claims. At minimum, the Court should award **attorneys' fees or**

**additional damages** if it finds that Defendants' use of the legal system (arbitration

clauses, etc.) in bad faith justifies a deterrent sanction.

**WHEREFORE,** Plaintiff prays for relief on this cause of action for

not less than $ 500,000,000,000.00 including an award of **compensatory damages**

for the loss of contract benefits due to Defendants' bad faith, and any appropriate

**special or consequential damages** resulting from the covenant breach. Plaintiff also seeks **equitable relief** as needed to restore him to the position he would have been in had Defendants acted in good faith – for example, an order undoing any contract-frustrating arrangements (such as requiring data return). Plaintiff further requests **costs of suit, and such other relief** as the Court deems just and proper.

---

## FIFTH CAUSE OF ACTION

### Unjust Enrichment / Restitution

*(Against All Defendants)*

69. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70. **Unjust Retention of Benefit:** Defendants have obtained and retained significant benefits at Plaintiff's expense, under circumstances that make it unjust for them to do so. Specifically, **23andMe, Inc.** obtained monetary payment from Plaintiff (for the DNA kit and service) and also derived value from

Plaintiff's Genetic Data (which enhanced the value of its database and was a resource for research/commercial endeavors). **TTAM** and **Anne Wojcicki** have likewise obtained benefits: TTAM acquired the entire customer database and ongoing business (including Plaintiff's data) for a bargain price, and Wojcicki, as the controlling person, regained leadership of a valuable enterprise. These benefits were **conferred by Plaintiff (and others)** through their purchase and data provision, and subsequently through the bankruptcy sale which transferred assets imbued with Plaintiff's data.

71. **Inequity of Retention:** It is unjust for Defendants to retain these benefits because the manner in which they were obtained and held violates fundamental principles of fairness and public policy. Plaintiff provided his Genetic Data and payment based on trust and specific assurances – Defendants breached that trust and then maneuvered to avoid compensating Plaintiff or honoring his rights. Allowing Defendants to keep the **profits and value derived from Plaintiff's Genetic Data** (such as the $305 million TTAM paid, or any increased value in Wojcicki's stake) without compensating Plaintiff would effectively sanction a scenario in which Defendants **profit from their own wrongs**. Unjust enrichment law prevents exactly this type of windfall.

72. **Benefits and Value at Issue:** To illustrate the unjust enrichment: 23andMe's genetic database was a core asset that attracted interest from buyers (like Regeneron). The value of that database is directly proportional to the number of individuals in it – including Plaintiff. Without Plaintiff's data (and that of others), 23andMe's asset value would diminish. Thus, a portion of the $305 million sale price is fairly attributable to Plaintiff's Genetic Data. Moreover, 23andMe saved money by not implementing robust security (they avoided costs at the expense of Plaintiff's security) – essentially, they **unjustly enriched themselves by skimping on safeguards**, reaping short-term savings that led to Plaintiff's harm. Equity demands disgorgement of such gains.

73. **Constructive Trust:** Plaintiff seeks the imposition of a **constructive trust** over his Genetic Data and any proceeds derived from it. Defendants hold Plaintiff's property (his Genetic Data and the informational content derived from his DNA) under circumstances that make it **against equity and good conscience** for them to claim sole ownership. TTAM, in particular, is effectively holding stolen property – or at least property that was transferred in breach of obligations – and should be deemed an involuntary trustee of that data for Plaintiff's benefit. Similarly, any funds gained by 23andMe or Wojcicki as a

result of using or transferring Plaintiff's data should be traced and subjected to restitution.

74. **No Adequate Remedy at Law:** While Plaintiff has legal claims as well, unjust enrichment covers potentially distinct relief – namely, the return of ill-gotten gains and disgorgement of profits. If, for any reason, legal damages do not fully compensate Plaintiff (for example, if contract damages are limited or if certain Defendants are not held on legal claims due to privity issues), the Court should still award restitution to prevent unjust enrichment. This claim is pled in the alternative to contractual claims, to account for the possibility that a contract might be deemed void or unenforceable in some respect (in which case equity and quasi-contract would step in).

75. **Damages/Relief:** Plaintiff is entitled to restitution in an amount to be proven at trial, including but not limited to: the proportionate value of the 23andMe/TTAM enterprise attributable to his data, the profits earned by Defendants from any research or products developed using his genetic information, and the refund of monies paid for a service not legitimately provided. Additionally, Plaintiff asks the Court to compel Defendants to relinquish any remaining property of Plaintiff (e.g., data, DNA sample) and to disgorge any benefits unjustly obtained.

**WHEREFORE,** Plaintiff seeks **restitutionary relief** against Defendants. This includes an order that Defendants **disgorge all unjust profits and benefits** acquired through the misuse of Plaintiff's Genetic Data and the breach of privacy, and pay such sums over to Plaintiff. Plaintiff further requests that a **constructive trust** be imposed on Plaintiff's Genetic Data in Defendants' possession (and on any proceeds from its commercialization) to ensure it is not exploited and can be returned or destroyed in Plaintiff's interest. Plaintiff also seeks **pre-judgment interest** on monetary restitution to prevent Defendants from benefitting from the time value of ill-gotten gains, and any other relief the Court deems just and proper to remedy the unjust enrichment.

---

### SIXTH CAUSE OF ACTION

**Conversion** *(and Trespass to Chattels)*

*(Against 23andMe, Inc. and TTAM)*

76. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

77. **Plaintiff's Ownership and Possessory Interest:** Plaintiff has an ownership or at least a possessory interest in his own genetic material and the data

derived from it. This includes: the physical DNA sample he provided (his saliva and extracted DNA) and the digital genetic information (his genotype data and associated personal information) that 23andMe generated and stored. Under California law and general principles of property and privacy, an individual's genetic information is part of their persona and effects; Plaintiff did not relinquish ownership simply by allowing 23andMe to analyze it. Indeed, 23andMe's terms acknowledged that individuals retain an ownership interest in their Genetic Data. At minimum, Plaintiff had the right to **control the use and disposition** of his Genetic Data, which is a property right cognizable at law.

78. **Wrongful Dominion or Control by Defendants:** Defendants 23andMe and TTAM wrongfully exercised dominion and control over Plaintiff's Genetic Data in a manner inconsistent with Plaintiff's rights. The wrongful acts include:

- **Unauthorized Sale/Transfer:** 23andMe treated Plaintiff's Genetic Data as its own asset to sell. When 23andMe included Plaintiff's data in the package of assets transferred to TTAM (and touted the size and value of its database to bidders), it engaged in an act of dominion contrary to Plaintiff's ownership interest. Plaintiff **never consented** to any sale or transfer of his data to a third party.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 62

- **Retaining Data After Withdrawal of Consent:** Through his actions (opting out of research and putting the company on notice of legal action), Plaintiff effectively communicated that he did not consent to further use of his data beyond the original service. By retaining his data and then passing it to TTAM even after Plaintiff's relationship with 23andMe had soured, Defendants retained possession against Plaintiff's will.

- **Refusal to Return/Delete:** Any demand by Plaintiff for return or deletion of his Genetic Data (and Plaintiff hereby alleges that any such demand would be futile given Defendants' stance) has not been honored. To the contrary, TTAM continues to hold the data. This **refusal to relinquish** Plaintiff's property upon rightful demand constitutes conversion.

79. **Substantial Interference:** Defendants' conduct has substantially interfered with Plaintiff's property rights in his Genetic Data. The interference is so severe as to justify a forced judicial sale or return. Plaintiff has been effectively **deprived of the use of his property** – he cannot fully trust or use his genetic information knowing it's compromised and in others' hands, and he certainly cannot exclude others from it (a key incident of ownership) because Defendants' acts have allowed unauthorized parties to obtain it. In law, conversion does not require physical taking of a tangible object; the appropriation of intangible interests

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 63

(like confidential information or personal data) coupled with **economic value** has been recognized as conversion in modern jurisprudence. Here, Plaintiff's Genetic Data has significant economic and personal value, and Defendants have **appropriated it for themselves**.

80. **Trespass to Chattels (in the alternative):** Even if the entirety of Plaintiff's property interest is not recognized as "converted," Defendants' actions at least constitute trespass to chattels. By intermeddling with an asset in which Plaintiff has a substantial possessory interest (his data and sample) without consent, Defendants have **impaired the condition, value, and quality** of that asset from Plaintiff's perspective. Plaintiff's ability to exclusively control and benefit from his Genetic Data has been seriously interfered with – effectively destroyed – by Defendants' actions. This intermeddling caused harm (loss of privacy and value), which suffices for trespass to chattels and also underscores the conversion.

81. **TTAM's Liability:** Defendant TTAM is fully liable for conversion as it was **not a good-faith purchaser for value** in the traditional sense. TTAM knew, or should have known, that the assets it was acquiring included personal Genetic Data obtained under certain privacy commitments. TTAM, being controlled by the same person who led 23andMe, had intimate knowledge of the circumstances and the likely lack of proper consent for the data transfer. By

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 64

proceeding to acquire and keep Plaintiff's data, TTAM stepped into the shoes of the converter and is equally liable for the tort. Moreover, TTAM's continuing control over the data (and potential use or commercialization of it) represents a **new conversion each day** it withholds the property from Plaintiff.

82. **Damages:** As a result of Defendants' conversion, Plaintiff has suffered damages. The measure of damages for conversion is typically the **value of the property at the time of conversion** plus any consequential losses. Plaintiff's Genetic Data can be valued in multiple ways: the amount a willing buyer would pay for such data, or the proportion of the overall database value attributable to one person. Given that 23andMe's database was valued in the tens or hundreds of millions of dollars, each individual's data can be estimated to have significant value (even a few dollars per person on a 14 million person database would run into tens of millions total; some individuals' data—especially if linked to medical info—could be worth far more in research markets). Plaintiff also values his data highly for personal reasons (priceless, in some respects, due to its uniqueness). Additionally, Plaintiff's **emotional distress and loss of privacy** are consequences of the conversion and trespass, and while those are addressed in other tort claims, they are also a result of being deprived of his property and should be compensable

here to the extent allowed. Plaintiff seeks recovery of the full value of his Genetic Data and related losses.

83. **Punitive Aspect:** Defendants' conversion was **willful and malicious**. 23andMe knew it didn't have the right to sell users' data in the way it did, yet chose to do so to benefit insiders. Such conduct shows a conscious disregard for Plaintiff's property rights. Therefore, Plaintiff seeks punitive damages under this cause of action as well, to punish Defendants for the intentional appropriation of property.

**WHEREFORE,** Plaintiff prays for relief on this cause of action as follows: for a judgment of **conversion** against Defendants 23andMe, Inc. Anne Wojcicki and TTAM Research Institute, holding them jointly and severally liable for the value of Plaintiff's converted Genetic Data and for all proximately caused damages for no less than $ 500,000,000,000.00. Plaintiff seeks **compensatory damages** for no less than $500,000,000,000.00 and/or in an amount to be determined at trial, including the value of the data and any consequential losses (with interest from the time of conversion). Plaintiff further seeks **punitive damages** for no less than $ 500,000,000,000.00 given the willful nature of Defendants' misconduct. Additionally, Plaintiff requests **injunctive relief** in the form of an order compelling Defendants to return or destroy any of Plaintiff's

Genetic Data in their possession (effectively restoring the property to Plaintiff and preventing further misuse and to retrieve Plaintiffs genetic data and all its copies from the hackers, purported hackers and any and all third parties). Such relief is necessary because monetary damages alone are inadequate to make Plaintiff whole concerning ongoing use of his unique genetic information.

---

## SEVENTH CAUSE OF ACTION

### Fraudulent Concealment

*(Against 23andMe, Inc. and Anne Wojcicki)*

84. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85. **Concealment of Material Facts:** Defendants 23andMe and Anne Wojcicki intentionally **concealed and suppressed material facts** from Plaintiff, to his detriment. These material facts include: (a) the **true scope, nature, and extent of the October 2023 data breach**, including how many users were affected and what types of data were accessed; (b) the **security deficiencies** that led to the breach, and the fact that the breach was ongoing or more severe than initially portrayed; (c) Defendants' **internal plans** post-breach to limit liability via class

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 67

action settlements and bankruptcy (information which, if known, would have prompted Plaintiff to take different actions, such as objecting or ensuring his rights were reserved); and (d) the fact that **Plaintiff's Genetic Data was slated to be sold or transferred** to TTAM without his consent. Each of these is a material fact because a reasonable person in Plaintiff's position would consider it important in deciding how to protect their interests – for instance, whether to continue entrusting data to 23andMe, whether to seek legal action immediately, or whether to delete one's data or sample.

86. **Duty to Disclose:** Defendants had a duty to disclose these material facts to Plaintiff. This duty arose from multiple sources: Defendants made partial representations that were misleading (e.g., announcing a limited "targeted" breach, implying things were under control, which triggered a duty to disclose the full truth so as not to mislead); there existed a **relationship of trust** between 23andMe and Plaintiff (a fiduciary or quasi-fiduciary duty can be found in the context of privacy – 23andMe held extraordinary power over Plaintiff's personal information and had superior knowledge about the breach); and 23andMe had **exclusive knowledge** of material facts (like the breach details and sale plans) not accessible to Plaintiff, making nondisclosure inherently deceptive. Anne Wojcicki, as an officer and

participant, likewise had a duty not to conceal as she engaged with customers and regulators while aware of undisclosed truths.

87. **Intent to Defraud:** Defendants concealed these facts with the intent to defraud and induce Plaintiff's reliance. They aimed to **avoid an uproar** and prevent users like Plaintiff from swiftly taking action that could disrupt Defendants' plans. For example, by concealing the breadth of the breach, Defendants intended that Plaintiff (and others) would not immediately flood them with deletion requests or legal claims thereby preserving the value of the compromised DNA data, buying Defendants time to execute the bankruptcy and asset transfer. By not disclosing the TTAM transfer plans, Defendants prevented Plaintiff from seeking relief in the bankruptcy court or otherwise objecting. Anne Wojcicki and her team knew that telling the full truth would expose them to greater liability and jeopardize the delicate negotiations for the sale and class settlement, so they chose a path of obfuscation.

88. **Justifiable Reliance:** Plaintiff was **ignorant of the concealed facts** and justifiably relied on the incomplete and misleading information provided. Specifically, when 23andMe gave assurances in late 2023 that the breach was

limited or being handled, Plaintiff believed that representation and did not immediately pursue extreme measures (like filing suit or deleting his data). Plaintiff also continued to maintain his account (under pseudonym) to monitor the situation, not knowing that behind the scenes his rights were being bartered away. Plaintiff had no reason to distrust 23andMe's public communications at that time – as a consumer, he expected candor in breach notifications as required by law. Moreover, even up to the bankruptcy filing, Plaintiff was not aware that his data would be treated as an asset; he relied on the assumption (reasonable under GIPA, privacy norms, government protections, the Constitution of the United States and the State of California) that his data could not be sold without consent. Defendants' concealment thus influenced Plaintiff's decisions and positioning, to his detriment.

89. **Resulting Damage:** As a proximate result of Defendants' fraudulent concealment, Plaintiff suffered damages. Had Plaintiff known the truth in a timely manner, he would have taken steps to protect himself. For example, he could have filed an earlier lawsuit or sought a protective order to prevent transfer of his data, or he could have rallied other users and authorities to object to the sale. By the time Plaintiff learned of many of these facts (piecemeal through news or after events were set in motion), it was largely too late – the damage was done. Thus, Plaintiff's ability to mitigate harm was thwarted, leading to greater

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 70

emotional distress (from feeling blindsided and betrayed) and potentially reduced legal options (as Defendants now argue his claims are limited by the bankruptcy outcome). Additionally, Plaintiff incurred expenses and effort in belatedly responding to these issues (such as participating in the bankruptcy process to fight discharge of his claims – a fight necessitated by earlier concealment). All these are tangible and intangible harms flowing from the fraud.

90. **Oppression, Malice, Fraud for Punitive Damages:** Defendants' conduct in this cause of action was intentional, egregious, and undertaken with malice and fraud. They willfully deceived Plaintiff to gain advantage. Therefore, Plaintiff not only seeks compensatory damages but also **punitive damages** against 23andMe and Anne Wojcicki to punish and deter such deceptive conduct. Additionally, as this is an action for fraud, Plaintiff is entitled to **recover his reasonable attorneys' fees and costs** in pursuing this claim, under any applicable statutes or as punitive component, given that Defendants acted in conscious disregard of Plaintiff's rights.

**WHEREFORE,** Plaintiff prays for relief on this cause of action as follows: for an award of not less than $ 5000,000,000,000.00, **general and special damages** according to proof (including, but not limited to, damages for emotional distress and the cost of measures taken due to the concealment), for **exemplary**

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 71

**and punitive damages** in an amount sufficient to punish Defendants and deter future fraudulent conduct, and for any further relief deemed just and proper. Plaintiff also seeks **rescission or nullification** of any transactions insofar as they were consummated under fraudulent pretenses (for example, a declaration that the sale of his data to TTAM is void due to fraud). Finally, Plaintiff requests that **costs of suit and any applicable attorneys' fees** be awarded in connection with this fraud claim.

---

## EIGHTH CAUSE OF ACTION

**Invasion of Privacy – Public Disclosure of Private Facts**

*(Against All Defendants)*

91. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92. **Private Facts at Issue:** Plaintiff's Genetic Data, and the personal information attached to it (such as health-related insights, ancestry details, relative connections, etc.), constitute **private facts** about Plaintiff. This information is of a

highly sensitive nature; it pertains to Plaintiff's health predispositions, genetic

traits, and familial lineage – details that one would normally keep confidential and

not share with the public at large. Prior to the events described, these facts were not

publicly known. Plaintiff had an expectation that his genetic profile would remain

private between himself and 23andMe (and any research partners only to the extent

of anonymized data if he had consented, which he did not). Additionally, Plaintiff

used a pseudonym on the 23andMe platform to further shield his identity,

underscoring that this information was meant to remain private.

93. **Public Disclosure:** Defendants, by their actions and omissions,

**publicly disclosed** these private facts to unauthorized third parties. The October

2023 breach resulted in Plaintiff's Genetic Data being acquired by hackers and

potentially **posted or sold on online forums**, making it accessible to a broad

audience of strangers and bad actors. Even if not posted in full publicly, the sale of

data on the dark web is tantamount to public disclosure for privacy law purposes,

because the information is no longer confidential and can spread uncontrollably.

Furthermore, the transfer of Plaintiff's data to TTAM and potentially to other

business partners or researchers without his consent also constitutes disclosure

beyond the circle of intended confidentiality (since Plaintiff did not agree to share

his data with those entities). Each Defendant is responsible: 23andMe's negligent

security and failure to contain the breach enabled the disclosure; Wojcicki and

others decided to move the data to TTAM and thereby exposed it to more eyes;

TTAM's acquisition means more individuals (staff, etc.) have access to Plaintiff's

data without his permission.

94. **Offensiveness:** The public disclosure of Plaintiff's genetic and

personal information is **highly offensive to a reasonable person**. Genetic

information is widely recognized as one of the most intimate categories of personal

data – it can reveal sensitive information about one's health (e.g., risk of diseases,

carrier status for conditions, mental health indicators), identity (ethnic heritage,

biological relationships), and even propensity for certain behaviors. A reasonable

member of the general public would consider it egregious and deeply intrusive for

such information to be exposed en masse due to corporate irresponsibility or

machination. Indeed, state laws like GIPA and federal authorities treat genetic data

with heightened confidentiality precisely because its unauthorized disclosure is so

offensive and harmful. In Plaintiff's case, he has suffered humiliation, anxiety, and

distress knowing that strangers might know intimate details coded in his DNA. The

offensiveness is exacerbated by the fact that Defendants were in a position of trust

and the breach of privacy was not a one-off error, but a combination of negligence

and deliberate corporate moves.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 74

95. **Not of Legitimate Public Concern:** Plaintiff's private genetic information is **not newsworthy** or of legitimate public concern. There is no public interest in Plaintiff specifically that would justify the exposure of his identity or genetic traits; he is a private individual who did not consent to being a subject of public attention in this regard. Even if there might be public curiosity generally about genetic data (for example, in aggregate research or public health contexts), that does not extend to an identifiable person's DNA profile. The disclosure here was a byproduct of a data breach and corporate deal – not something like protected free-speech journalism or whistleblowing that might attach to a matter of public concern. Thus, this case falls squarely into the realm of wrongful public disclosure of private facts lacking any redeeming public value.

96. **Damages:** Plaintiff has suffered damages from this invasion of privacy. These include **mental anguish, embarrassment, and emotional distress** upon learning that intimate details about himself could be known to others without his control. He must worry about how this data might be used to stigmatize or target him (for instance, if an insurer somehow got his genetic info showing risk factors, or if malicious actors tried to extort or harass him with knowledge of private family connections). The loss of privacy itself is a harm that the law recognizes in such tort claims, even if specific dollar amounts are not easily

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 75

assigned. Plaintiff will rely on the evidence and perhaps expert testimony to quantify the extent of his emotional and dignitary harm. He also seeks **presumed damages** to the extent allowed, given the willful nature of the invasion and the difficulty in fully capturing the harm in economic terms.

97. **Injunctive Relief:** Because the information (Plaintiff's Genetic Data) remains out in the world, Plaintiff seeks injunctive relief as part of this cause of action. Specifically, Plaintiff requests that the Court order Defendants to **identify and notify all third parties** to whom Plaintiff's Genetic Data was disclosed (to the extent known) and to **secure or retrieve and destroy** any copies of the data within their power. Although one cannot "unring the bell" of a data leak, steps can be taken to prevent further spread and to mitigate harm (for example, compelling TTAM to cease any sharing of the data and to tighten access controls, etc.).

98. **Punitive Aspect:** Defendants' conduct showed a **reckless disregard** for Plaintiff's privacy rights (and in certain respects, an intentional strategy that risked such rights). Therefore, Plaintiff seeks **punitive damages** on this privacy claim as well, to deter Defendants and others from taking privacy so lightly. Courts have allowed punitive damages in privacy tort cases where, as here, the conduct is egregious.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 76

**WHEREFORE,** Plaintiff prays for relief on this cause of action for no less than $500,000,000,000.00, including an award of **general damages** for the harm to his privacy and peace of mind, **special damages** according to proof for any measurable losses, and **punitive damages** in an amount sufficient to punish Defendants and deter future invasions of privacy. Plaintiff also seeks appropriate **injunctive relief** to prevent any further disclosure or misuse of his private facts (such as orders requiring data deletion and prohibiting Defendants from profiting off Plaintiff's data). Additionally, Plaintiff asks for **costs of suit and any further relief** the Court deems just to compensate for and remedy the invasion of his privacy.

_____

## NINTH CAUSE OF ACTION

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 77

## Negligent and Intentional Infliction of Emotional Distress

*(Against All Defendants)*

99. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100. **Extreme and Outrageous Conduct:** Defendants' conduct, as described above, was **extreme and outrageous**, exceeding all bounds of decency tolerated in a civilized society. It is hard to conceive of a more personal violation than taking a person's genetic essence and allowing it to fall into the hands of strangers, then scheming to deny that person any remedy. Defendants not only failed to protect Plaintiff's Genetic Data (which could be considered grossly negligent), but they then engaged in a pattern of deceit and legal manipulation to avoid accountability – conduct that society would find profoundly reprehensible. The calculated nature of the conspiracy (leveraging state power to suppress rights) and the betrayal of trust involved in using someone's DNA for profit while evading responsibility elevates this case to the level of outrageousness required for intentional infliction of emotional distress (IIED). Likewise, even under a negligent infliction (NIED) standard, the breach of a duty that directly results in severe emotional trauma to Plaintiff, given the personal aspect of genetic privacy, is actionable.

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 78

101. **Intent or Reckless Disregard (for IIED):** Defendant Anne Wojcicki and others in leadership positions **intended to cause emotional distress** to Plaintiff or, at a minimum, acted with **reckless disregard** of the near certainty that emotional distress would result. When Defendants concealed the breach and sold the data, they knew that if Plaintiff discovered the truth, he would be justifiably horrified, panicked, and emotionally devastated. In fact, causing such despair can be seen as part of the scheme – to make individuals feel powerless so they wouldn't fight back effectively. Even if Defendants didn't specifically wish to torment Plaintiff (whom they likely viewed as just one of many users), they consciously proceeded with actions that any reasonable person would recognize as overwhelmingly likely to cause severe emotional harm to those affected. This satisfies the intent requirement for IIED.

102. **Negligence (for NIED):** Alternatively, even if one views Defendants' actions through the lens of negligence, they breached duties in a way that **unreasonably endangered Plaintiff's mental and emotional well-being**. Privacy breaches of this sort are known to cause significant psychological distress; Defendants' negligence in preventing the breach and handling its aftermath directly led to foreseeable emotional injury. Under California law, NIED is not a separate tort but negligence applied to emotional harm; here, all elements of

negligence have been established in earlier causes, and the resulting harm is primarily emotional – making NIED an appropriate characterization as well.

103. **Severe Emotional Distress:** Plaintiff has suffered **severe emotional distress** as a result of Defendants' conduct. He experiences anxiety, sleeplessness, feelings of betrayal and violation, and persistent fear about how his Genetic Data might be used against him now or in the future. The distress is not trivial or transitory; it is profound and enduring. Plaintiff finds himself obsessively worrying if unknown people are accessing information about his health or family that he never chose to share. He has had trouble concentrating on daily tasks, and his sense of personal security is shattered. These are precisely the types of serious emotional consequences that one would expect from such an intimate violation. Plaintiff may present medical or expert testimony at trial to further describe the extent of his emotional and psychological injuries (such as increased risk of depression or PTSD-like symptoms stemming from betrayal trauma).

104. **Causation:** Defendants' actions were a **substantial factor** in causing Plaintiff's emotional distress. Plaintiff's turmoil began when he learned of the breach and grew exponentially worse as revelations came that his data was sold and that he faced a wall of legal impediments to recourse. But for Defendants' wrongful conduct, Plaintiff would not be in this state of mental anguish. There

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 80

were no superseding causes – the harm flows naturally from Defendants' breach of trust and subsequent conspiracy. It is well-established that invasion of privacy and loss of control can cause emotional harm; indeed, such harm is often the primary damage, as it is here.

105. **Damages:** Plaintiff seeks damages for the emotional distress inflicted. In an IIED claim, these would be general damages reflecting the pain, suffering, and anguish endured. Plaintiff also seeks any economic damages that are the result of his emotional distress (for example, if he sought therapy or counseling due to this ordeal, or if his distress impacted his ability to work, those could be quantifiable). The law does not require physical injury to recover for emotional distress in such egregious circumstances – the **intangible injury** to Plaintiff's psyche is itself compensable. Additionally, given the malicious and reckless nature of Defendants' conduct, Plaintiff seeks **punitive damages** under the IIED theory as well.

106. **Punitive Elements:** For clarity, Plaintiff emphasizes that Defendants' conduct was fraudulent, oppressive, and malicious (as defined by Cal. Civ. Code § 3294). They acted with willful and conscious disregard of Plaintiff's rights and with despicable conduct that has subjected Plaintiff to cruel and unjust

hardship (mentally and emotionally). Therefore, beyond compensatory relief, punitive damages are warranted to punish and deter.

**WHEREFORE,** Plaintiff prays for relief on this cause of action as follows: for an award of not less than $500,000,000,000.00, **damages for emotional distress of not less than** $5000,000,000,000.00, and in an additional amount to be determined by the trier of fact, reflecting the severity of Plaintiff's mental suffering. Plaintiff also asks for **punitive damages** against all Defendants, to the extent their conduct is found intentional or grossly reckless, in order to punish and make an example of them of not less than $500,000,000,000.00. In the alternative (under NIED), Plaintiff seeks all compensatory damages allowable for the serious emotional harm caused by Defendants' negligence for not less than $500,000,000,000.00. Plaintiff further requests **costs of suit** and such other relief as the Court deems just and proper to compensate for the mental anguish and ensure such conduct is not repeated.

_____

## **TENTH CAUSE OF ACTION**

## Civil Conspiracy

*(Against All Defendants)*

107. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 106 as though fully set forth herein.

108. **Agreement and Common Plan:** Defendants 23andMe, Inc., Anne Wojcicki, TTAM Research Institute, and Does 1–20 (inclusive of any as-yet-unidentified collaborators) formed a **combination, agreement, or understanding** to accomplish the unlawful acts described in this Complaint. Specifically, Defendants agreed (explicitly or tacitly) to engage in a scheme to: **unlawfully obtain and retain Plaintiff's Genetic Data**, conceal their misdeeds, exploit the data for profit, and **deprive Plaintiff of legal recourse** through misuse of legal processes. This conspiracy began no later than October 2023 (when the breach occurred and plans were hatched to mitigate liability) and continued through the bankruptcy sale to TTAM and beyond. The central objective of the conspiracy was to **protect Defendants' interests at the expense of Plaintiff's rights**, by using coordinated actions that no single defendant could fully achieve alone.

109. **Unlawful or Tortious Acts:** The conspiracy's goal and means were inherently unlawful and tortious. The underlying wrongful acts that

Defendants conspired to commit (and did commit) include: **negligence/gross negligence** in handling genetic data; **fraudulent concealment** of the breach and related facts; **conversion** of Plaintiff's property; **invasion of privacy**; and **violations of constitutional rights** under color of law (addressed in subsequent causes). Additionally, Defendants conspired to violate statutes or public policy, such as provisions of the California Genetic Information Privacy Act (by transferring data without consent) and potentially federal law (to the extent the scheme involved defrauding the bankruptcy court or violating 18 U.S.C. § 1343 – wire fraud – by deceiving individuals electronically). Any one of these underlying acts provides a foundation for a civil conspiracy, as does the overarching plan to **obstruct justice and due process** for Plaintiff, which implicates 42 U.S.C. § 1983 as detailed later.

110. **Overt Acts in Furtherance:** In furtherance of the conspiracy, Defendants each committed **overt acts**. Among them: 23andMe (through its officers) **intentionally delayed and misrepresented** information about the breach (overt act of concealment); Wojcicki orchestrated the **bankruptcy filing and creation of TTAM** (overt acts to shift assets); TTAM, once formed, entered into the **asset purchase agreement** and took possession of the data (overt act to finalize the objective of placing data beyond users' reach); and all Defendants

participated in **invoking legal barriers** (such as seeking to enforce arbitration, class releases, and using the bankruptcy stay) to block Plaintiff's scrutiny and claims (overt acts to suppress Plaintiff's rights). Additionally, communications among Defendants (for instance, between Wojcicki and others about ensuring the sale goes through despite state objections) are overt acts that will likely be evidenced in email or meeting records. Each overt act was done in pursuit of the conspiracy's objectives.

111. **Knowledge and Intent:** Each Defendant knew or had reason to know the wrongful nature of the plan and nonetheless agreed to join and further it. Wojcicki, as the common thread, absolutely knew the ramifications of the scheme – she personally benefited by continuing control via TTAM and sought to escape liability. 23andMe, through its board or executives, made decisions aligning with this plan (opting not to notify users properly, electing to file bankruptcy, etc.). TTAM, although a new entity, was created for the very purpose of this plan and operated from inception with knowledge (through Wojcicki and possibly others who joined TTAM's board or management) that it was part of a scheme to pick up assets without liabilities. The Doe defendants may include lawyers, consultants, or even officials who knowingly facilitated one or more steps (for example, by drafting misleading statements or fast-tracking the sale). The common **intent** was

to commit the underlying torts and to benefit Defendants while harming Plaintiff

(and others like him).

112. **Conspiracy with State Actors (reiteration):** To the extent that

part of the conspiracy was to act under color of state law (addressed in the next

cause under §1983), Plaintiff incorporates that Defendants conspired with one or

more persons who are state government actors. This includes potentially the

bankruptcy trustee or court officials insofar as orders were procured via

misrepresentation (fraud on the court), and possibly legislative or executive branch

individuals who were co-opted or misled to aid the scheme. Such state involvement

is not necessary to prove conspiracy in general (private parties can conspire

amongst themselves), but it is relevant to show the breadth and audacity of the

agreement. At minimum, all Defendants conspired among themselves (private

actors) to commit the aforementioned wrongs.

113. **Damages from Conspiracy:** As a result of the conspiracy and

the acts done pursuant to it, Plaintiff suffered the various injuries detailed

throughout this Complaint. The conspiracy effectively **amplified and

compounded** the harm: whereas one defendant's negligence might have "only"

caused a data breach, the concerted plan to cover it up and avoid liability caused

Plaintiff additional emotional distress, loss of rights, and necessitated this complex

legal battle. By virtue of the conspiracy, each Defendant is **jointly and severally liable** for the full extent of Plaintiff's damages arising from the conspiracy's objects. This means TTAM and Wojcicki, for example, can be held liable for the negligence and privacy breaches orchestrated initially by 23andMe, because they joined the plan to handle those breaches in a wrongful way. Without the conspiracy, Plaintiff might have contained his damages (for instance, prompt breach notification could have allowed some mitigation), but the conspiracy ensured maximal damage by stringing Plaintiff along with false hopes and then slamming the door on him.

114. **Equitable Tolling and Fraudulent Concealment Doctrine:** As an aside, the existence of this conspiracy (particularly the fraudulent concealment aspect) should equitably toll any statute of limitations that Defendants might attempt to assert. Defendants should not benefit from time passing while they hid their wrongdoing. Plaintiff diligently pursued his rights once the layers of the conspiracy became apparent.

115. **Punitive and Exemplary Relief:** Civil conspiracy itself is not a separate tort for damages beyond the underlying acts, but it does allow Plaintiff to impose liability on all Defendants for each other's wrongful acts. Given the **malicious and willful** nature of this conspiracy, Plaintiff seeks to impose punitive

damages on each Defendant in respect to the egregious collective conduct. The conspiracy demonstrates an organized, deliberate violation of rights that punitive damages are meant to punish.

**WHEREFORE,** Plaintiff prays for relief under this cause of action for not less than $500,000,000,000.00 and in the following ways: that the Court **find each Defendant liable for all torts committed by any one of them** in furtherance of the conspiracy, and award **joint and several damages** accordingly; that **punitive damages** be assessed against each Defendant commensurate with their involvement and net worth, to punish their collective scheme; and that **attorneys' fees** be awarded as allowed by law (for example, under 42 U.S.C. §1988 for the civil rights conspiracy elements) or under the Court's equitable powers, given the willful and fraudulent nature of the conspiracy. Plaintiff also seeks **injunctive relief** dissolving or prohibiting any ongoing collaboration that results in the continued withholding of his Genetic Data or suppression of his rights—essentially, an order breaking up the unlawful enterprise and ensuring Plaintiff's rights are restored.

_____

## ELEVENTH CAUSE OF ACTION

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 88

## Violation of California Constitution – Article I, §§ 1 & 7

### *(Against All Defendants)*

116. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 115 as though fully set forth herein.

117. **Right to Privacy (Art. I, § 1):** Article I, Section 1 of the California Constitution provides that all people have an **inalienable right to privacy**. This provision has been interpreted to protect individuals against certain privacy invasions by private parties as well as government, especially in contexts where personal information is collected and disseminated. Plaintiff's genetic information and associated personal data fall squarely within the types of information one would reasonably expect to remain private. Plaintiff alleges that Defendants' conduct as described above **violated his right to privacy** under the California Constitution by disclosing and misusing his Genetic Data without consent, and by failing to implement reasonable safeguards to maintain its confidentiality. The egregious nature of the breach and sale shows a **serious invasion** of privacy that is constitutionally offensive (i.e., highly offensive and not justified by any legitimate competing interests).

118. **State Action/Private Conduct:** To the extent state action is required for a constitutional privacy claim (a matter of some nuance under California law, since the privacy right can apply to private entities in some circumstances), Plaintiff alleges that Defendants' actions were **entangled with state authority** (see the §1983 conspiracy claim) and/or that Defendants are of sufficient **societal significance** in handling genetic data that constitutional standards should apply. 23andMe effectively operates in a quasi-public sphere when it comes to personal data, and California's explicit inclusion of privacy in its Constitution suggests a public policy that even private actors must not intrude upon fundamental privacy without good cause. Here, no good cause existed—only profit and evasion of accountability. In any event, because Defendants utilized the **power of the state's courts and laws** (bankruptcy court approval, etc.) to accomplish their aims, this cause of action can also be seen as against those acts under color of law.

119. **Right to Due Process (Art. I, § 7):** Article I, Section 7 of the California Constitution guarantees that a person may not be deprived of life, liberty, or property without due process of law, and also contains an equal protection clause (though equal protection is not directly at issue here). Plaintiff contends that Defendants, acting in concert with state actors, effectively **deprived**

**him of property and liberty interests without due process**. Plaintiff's property interest in his Genetic Data was transferred and appropriated without notice or an opportunity to be heard (no meaningful hearing or opt-out was provided before the bankruptcy sale, for instance, and Plaintiff had no say in the class action settlement efforts). Likewise, Plaintiff's liberty interest in seeking redress (access to courts) was impeded by Defendants invoking state power (the automatic stay, etc.) to shut down his avenues. In a sense, Defendants co-opted state procedures to **take Plaintiff's property (his data) and bar him from pursuing claims, which is a denial of due process**. The California Constitution's due process protections, at minimum, echo the federal ones, and here the conduct described offends those principles.

120. **Color of Law/State Involvement:** As alleged, Defendants acted "under color of law" in many respects (though this phrasing is typically federal, we borrow it to illustrate state involvement). The entanglement with state action suffices to trigger constitutional scrutiny. For instance, the bankruptcy court's actions—arguably federal, but let's focus on state—the *class action settlement* attempt might have involved state court if it were filed there (initial suits might have been in state court before MDL). Additionally, California's own support for the sale (or lack thereof) is at issue. However, even if the Court finds insufficient

state action for a direct constitutional claim against private defendants, this cause of action is asserted in the alternative: to recognize that the **public policy embodied in the state Constitution was violated**, supporting tort liability under other claims as well.

121. **Harm from Constitutional Violations:** Plaintiff suffered harm from these constitutional violations in the form of lost privacy (intrinsic harm recognized by the Constitution) and lost opportunity to be heard (which has value in terms of procedural justice and peace of mind). The damages overlap with those in other claims: emotional distress, loss of property value of data, etc., but mentioned here to ground relief specifically in constitutional terms.

122. **Declaratory and Injunctive Relief:** Plaintiff seeks a **declaratory judgment** that Defendants' conduct violated his rights under the California Constitution. Such a declaration will serve to guide future behavior and affirm the wrongfulness of what occurred. Additionally, Plaintiff seeks **injunctive relief** as appropriate to prevent ongoing constitutional harms – for example, an injunction requiring Defendants to conform their conduct to privacy norms and perhaps to give Plaintiff a proper due process opportunity (though practically, that might mean involving him in any decisions about his data henceforth or requiring deletion).

123. **Attorneys' Fees:** Under California law (e.g., California Code of Civil Procedure § 1021.5, the private attorney general doctrine), Plaintiff may be entitled to attorneys' fees for vindicating important constitutional rights that benefit the public. This case raises novel and important issues about genetic privacy and due process. Plaintiff, through this action, seeks to enforce these rights not just for himself but to set precedent protecting all Californians. An award of fees would be justified if Plaintiff prevails on these constitutional claims.

**WHEREFORE,** Plaintiff prays for relief on this cause of action for not less than $500,000,000,000.00 and as follows: for a **judgment declaring** that Defendants have violated Plaintiff's privacy rights under Article I, § 1 of the California Constitution and his due process rights under Article I, § 7; for **injunctive relief** preventing Defendants from engaging in such conduct in the future (including but not limited to orders to return/delete Plaintiff's data and to not obstruct Plaintiff's access to legal remedies); for **compensatory damages** for not less than $500,000,000,000.00 and according to proof to redress the harm to Plaintiff's constitutional interests; and for the award of **reasonable attorneys' fees and costs** pursuant to Cal. Code Civ. Proc. § 1021.5 or other applicable law, as this action involves the enforcement of important rights affecting the public interest.

Plaintiff also requests any further relief deemed just and proper to ensure the full

effectuation of his state constitutional rights.

---

### TWELFTH CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983 (Conspiracy to Violate Civil Rights)**

*(Against All Defendants acting under color of state law)*

124. Plaintiff re-alleges and incorporates by reference paragraphs 1

through 123 as though fully set forth herein.

125. **Color of Law and Joint Action:** Defendants, though private

parties, acted **under color of state law** for purposes of 42 U.S.C. § 1983 by

willfully engaging in joint action and conspiracy with state officials, or by

substantially invoking state authority, to deprive Plaintiff of rights protected by the

U.S. Constitution. The misconduct detailed involved leveraging the **state's legal**

**processes** (e.g., state court approval of class settlements, state statutory regimes

like GIPA, and also the general invocation of judicial power) such that Defendants

became **joint participants** in state action. In particular, Defendants conspired with

and induced the involvement of (a) the California judiciary (to approve a class action settlement releasing claims), (b) possibly state executive officials (by manipulating how GIPA was enforced or not enforced in the context of the sale), and (c) any other government actors (e.g., using the bankruptcy court, which is federal, but the principle is analogous, as well as potentially coordinating with regulators to stand down). This alliance or symbiotic relationship with government satisfies the "color of law" requirement, as Defendants and state actors were intertwined in effectuating the deprivations in question. In the alternative, some of the Does 1–20 are likely state actors (for instance, if any official aided them), which directly brings § 1983 into play.

126. **Constitutional Rights Deprived:** Defendants, acting under color of law, deprived Plaintiff of rights secured by the **First, Fourth, Fifth, and Fourteenth Amendments** to the U.S. Constitution, including but not limited to:

- **First Amendment – Right to Petition:** Plaintiff has a First Amendment right to **petition the government for redress of grievances** (access to courts). Defendants conspired to infringe this right by invoking judicial processes (like the automatic stay and class action settlements) to block Plaintiff from having his day in court. By effectively buying a shield through the bankruptcy court and attempting to moot claims via a collusive class

settlement, Defendants, in coordination with those courts' machinery, **shut the courthouse doors** on Plaintiff. This constitutes state action (courts) being misused to quell Plaintiff's petitioning activity.

- **Fourth Amendment – Freedom from Unreasonable Searches and Seizures:** Plaintiff's Genetic Data is akin to **personal papers or effects**. Defendants' conspiracy with state actors resulted in the **seizure** of Plaintiff's property (his Genetic Data) without warrant, consent, or compensation. For example, the transfer of data to TTAM with court approval can be viewed as a state-sanctioned seizure or at least a **constructive seizure** under legal process. Moreover, any role of law enforcement (if any state investigation quietly accessed the data or any such angle) would implicate the Fourth Amendment directly. At its core, Plaintiff's expectation of privacy in his DNA was violated in a manner that involved state facilitation (the sale couldn't happen without the court).

- **Fifth and Fourteenth Amendments – Due Process:** Plaintiff was deprived of **property (his data and the value/rights attached) and liberty (the right to seek legal remedy)** without due process of law. The Fifth Amendment applies to federal actors (and here the bankruptcy court's actions are federal), while the Fourteenth applies to state. We assert under

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 96

§1983 primarily Fourteenth Amendment due process, because Defendants

conspired with state actors (e.g., possibly seeking favorable state legislative

or judicial outcomes) that resulted in Plaintiff's loss of property/rights

without notice or a hearing. The scheme to extinguish Plaintiff's claims and

transfer his data occurred without Plaintiff's meaningful participation, which

shocks the conscience and violates procedural due process. Additionally, the

**fundamental liberty interest in privacy** can be couched as a substantive

due process right (bodily autonomy and informational privacy are interests

recognized by courts); the state-enabled breach of Plaintiff's genetic privacy

violated this substantive due process right, absent any narrowly tailored

compelling interest.

- **Equal Protection (Fourteenth Amendment):** While not explicitly pleaded

  earlier, to the extent Plaintiff as a class-of-one was arbitrarily targeted or left

  without recourse due to Defendants' influence, there could be an argument

  that he did not receive equal protection of the laws (for instance, if other

  similarly situated victims who weren't caught in the bankruptcy got better

  treatment). However, Plaintiff will focus on the above rights primarily.

127. **Causal Link and Persons Liable:** Each Defendant, by virtue of

the conspiracy and joint action, is liable under § 1983 for the full extent of the

violations. They acted "in concert" with state actors – for example, making agreements that required court orders to implement – thus they can be considered to have caused those orders (such as the sale order) that resulted in constitutional deprivations. The state officials involved (judges signing orders, etc.) might have immunity themselves, but § 1983 reaches the private conspirators who willfully participate. The **causal nexus** is clear: Defendants set in motion a series of acts by the state (approval of sale, etc.) that they knew (and intended) would result in Plaintiff's loss of rights.

128. **Damages under § 1983:** Plaintiff has suffered damages as described – loss of property and privacy (Fourth/Fourteenth Amendments) and denial of the opportunity to seek redress (First/Fourteenth). Under § 1983, he is entitled to **compensatory damages** for these constitutional injuries. This includes the monetary value of his lost property interest and the monetary equivalent of his emotional distress and other consequential harms due to the constitutional violations. Notably, the privacy invasion and loss of recourse themselves are injuries that justify substantial compensation irrespective of out-of-pocket loss.

129. **Punitive Damages under § 1983:** Section 1983 allows for **punitive damages** against individual defendants (not governmental entities, but here all Defendants are private individuals or companies) when their conduct is

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 98

shown to be motivated by evil motive or intent, or involves reckless or callous

indifference to federally protected rights. Defendants' conduct meets this standard.

They callously disregarded Plaintiff's constitutional rights in pursuit of profit and

self-protection. Accordingly, Plaintiff seeks punitive damages under § 1983 against

Anne Wojcicki and any other individual defendants (and to the extent punitive can

be sought against the corporate entities under § 1983, which usually it can as they

are acting "person[s]" under the statute and not a municipality).

130. **Attorneys' Fees:** Section 1983 claims are enforceable with a

fee-shifting provision via 42 U.S.C. § 1988. Plaintiff requests an award of

**reasonable attorneys' fees and costs** if he prevails on this § 1983 claim, as part of

the relief to make him whole and encourage the vindication of civil rights.

131. **Declaratory and Injunctive Relief:** In addition to damages,

Plaintiff seeks **declaratory relief** under § 1983, declaring that Defendants' actions

violated his constitutional rights as alleged. This declaratory relief is important to

set the record straight and potentially to influence future behavior (especially of

TTAM as it operates going forward). Plaintiff also seeks **injunctive relief** as may

be necessary to ensure the protection of his rights – for example, an injunction

requiring Defendants to disgorge any data or profits obtained through the

unconstitutional acts, or to enjoin TTAM from using Plaintiff's data without a valid consent process overseen by the Court.

**WHEREFORE,** Plaintiff prays for judgment against all Defendants under 42 U.S.C. § 1983, jointly and severally where applicable, and requests: **compensatory damages for no less than** $500,000,000,000.00 **and** in an amount to be determined at trial for the violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights; **punitive damages** in an amount sufficient to punish Defendants' malicious or recklessly indifferent conduct but not less than $500,000,000,000.00; **declaratory relief** that Defendants' conduct violated Plaintiff's constitutional rights; **injunctive relief** to prevent further violations (such as an order commanding the return or destruction of Plaintiff's Genetic Data and prohibiting Defendants from interfering with his access to courts); and an award of **attorneys' fees and costs** pursuant to 42 U.S.C. § 1988. Plaintiff also seeks any further relief the Court deems just and proper to secure the full enjoyment of his civil rights.

_____

## **PRAYER FOR RELIEF**

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 100

WHEREFORE, Plaintiff Hector Gutierrez prays that this Court enter judgment in his favor and against Defendants, and grant the following relief:

**A. Declaratory Relief:** A declaration that Defendants' actions and omissions, as alleged, are unlawful and unconstitutional. This includes declarations that Defendants violated Plaintiff's rights under the U.S. Constitution (First, Fourth, and Fourteenth Amendments) and California Constitution, and that Defendants' conduct constitutes negligence, gross negligence, breach of contract, conversion, fraud, invasion of privacy, and other torts as set forth above.

**B. Injunctive Relief:** Preliminary and permanent injunctive relief to ensure the protection of Plaintiff's Genetic Data and personal information, and to prevent Defendants from profiting off or misusing that data. Such injunctive relief should include, but not be limited to:

1. **Cease Use of Data:** An order prohibiting Defendants, their agents, successors, and anyone acting in concert with them from further collecting, storing, analyzing, selling, transferring, or otherwise using Plaintiff's Genetic Data without Plaintiff's express written consent.

2. **Data Deletion and Return:** An order requiring Defendants to permanently delete and expunge Plaintiff's Genetic Data and all personal identifiers from

their systems, and to destroy any remaining biological samples of Plaintiff in

their possession. Additionally, an order mandating that Defendants notify

any third parties or research partners who received Plaintiff's Genetic Data

(directly or indirectly) to return or destroy such data, and to provide proof of

compliance to the Court.

3. **Accountability Measures:** An order imposing a constructive trust over

Plaintiff's Genetic Data and any proceeds derived from it, such that

Defendants hold it in trust for Plaintiff pending deletion. Also, an order

requiring Defendants to submit to an independent audit (at Defendants'

expense) to verify deletion of Plaintiff's data and to audit Defendants' data

privacy practices for a period of years, with results reported to the Court.

4. **No Retaliation / Access:** An order enjoining Defendants from obstructing or

interfering with Plaintiff's access to his own genetic information that was

provided (ensuring Plaintiff can obtain his raw data if he so desires before

deletion), and preventing Defendants from retaliating against Plaintiff for

bringing this action.

      **C. Compensatory Damages:** An award of compensatory damages for

no less than $500,000,000,000.00 and in an amount to be determined at trial, but

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY,
AND INJUNCTIVE RELIEF. - 102

no less than **$500,000,000,000.00** (Five hundred million dollars), to compensate Plaintiff for the following:

- Past, present, and future **economic losses** resulting from Defendants' conduct, including the loss of value in Plaintiff's personal property (Genetic Data), costs of credit or identity monitoring services, costs of medical or genetic privacy measures needed, and any other out-of-pocket expenses attributable to the breaches and misconduct.

- **General damages** for emotional distress, mental anguish, humiliation, and loss of enjoyment of life caused by the violation of Plaintiff's privacy and other wrongful acts. Given the unique and deeply personal nature of the data involved, Plaintiff suggests that the emotional harm is substantial and enduring.

- **Statutory damages** as allowed by law, including any liquidated damages or penalties under statutes like California's Customer Records Act or genetic

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 103

privacy laws (should the Court find them applicable through negligence per se or otherwise).

- **Restitutionary disgorgement** of any unjust enrichment obtained by Defendants through the unauthorized use or transfer of Plaintiff's Genetic Data, including disgorgement of a proportional share of the $305 million sale price to TTAM or other profits gleaned from research/commercial deals using Plaintiff's data.

        **D. Punitive Damages:** An award of punitive and exemplary damages against each Defendant, in an amount sufficient to punish their willful, malicious, and reckless conduct and to deter such conduct in the future. Plaintiff suggests that, given Defendants' resources and the egregious nature of their conduct, punitive damages on the order of **hundreds of millions of dollars** may be appropriate to achieve the purposes of punishment and deterrence (for example, an amount at least equal to or greater than the value Defendants placed on the Genetic Data they misappropriated, so that wrongdoing does not pay).

        **E. Equitable Relief:** Any further equitable relief the Court deems proper, including but not limited to rescission or reformation of any agreements

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 104

that purport to limit Defendants' liability or Plaintiff's rights (e.g., voiding any

arbitration clause, class action release, or bankruptcy discharge as it pertains to

Plaintiff's claims, due to Defendants' fraud and violation of law). Additionally,

issuance of an order that any genetic data of Plaintiff cannot be sold or transferred

without Court approval and Plaintiff's consent.

**F. Attorneys' Fees and Costs:** An award of Plaintiff's reasonable

attorneys' fees and litigation costs incurred in this action, pursuant to, inter alia, 42

U.S.C. § 1988 (for the § 1983 claim), California Code of Civil Procedure § 1021.5

(private attorney general doctrine), California Civil Code § 1780(e) or other

statutory fee provisions if applicable, and any other basis in law or equity. Given

the significance of the rights at stake and Defendants' intentional misconduct, fees

are warranted to enable Plaintiff to vindicate these rights.

**G. Pre- and Post-Judgment Interest:** An award of pre-judgment interest at

the maximum legal rate from the time of Plaintiff's injuries (or each component of

damage) until the date of judgment, and an award of post-judgment interest at the

legal rate from the date of judgment until paid, so that Plaintiff is fully compensated for the time value of money and Defendants do not profit from delay.

**H. Any Further Relief:** Such other and further relief as the Court deems just, equitable, and proper, including any relief not specifically requested above but that is within the Court's power to grant and necessary to effectuate justice in this matter.

"Plaintiff emphasizes that the following requests for bankruptcy-specific relief are made solely to preserve and protect Plaintiff's ability to prosecute his constitutional, statutory, and tort claims in the proper forum — the United States District Court for the Northern District of California. Plaintiff does not consent to the adjudication of those claims in this bankruptcy proceeding. Rather, Plaintiff seeks targeted relief from this Court only to (i) confirm that his genetic data and related rights are not property of the bankruptcy estate, (ii) obtain relief from the automatic stay so he may proceed in District Court, and (iii) ensure that any debt owed to him is not discharged. All other claims for damages, declaratory judgment, and injunctive relief are intended to be heard and decided in the District Court. **Accordingly, Plaintiff respectfully requests that this Court grant the additional bankruptcy-specific relief set forth below**".

ADV. PROC. NO. 25-04043-357AMENDED ADVERSARY COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF. - 106

## <u>Additional Relief Requested in Bankruptcy Court</u>

**WHEREFORE**, in addition to the damages, declaratory, and injunctive relief set forth above, Plaintiff further prays that this Court enter judgment providing the following bankruptcy-specific relief:

1. **Relief from the Automatic Stay (11 U.S.C. § 362(d))** – Granting Plaintiff relief from the automatic stay so that Plaintiff may prosecute all constitutional, statutory, and common-law claims in the United States District Court for the Northern District of California, or any other proper forum, without restriction by this bankruptcy proceeding.

2. **Determination of Nondischargeability (11 U.S.C. § 523)** – Declaring that any debt owed to Plaintiff arising from Defendants' fraud, willful and malicious injury, and constitutional deprivations shall be nondischargeable in this or any related bankruptcy proceeding.

3. **Declaration that Plaintiff's Genetic Data Is Not Property of the Estate** – Entering a declaratory judgment that Plaintiff's personal genetic information, DNA, and derivative data are not and never were "property of

the estate" under 11 U.S.C. § 541, and therefore cannot lawfully be

transferred, sold, or disposed of through these bankruptcy proceedings.

4. **Injunctive Relief Regarding Estate Administration** – Issuing an

injunction prohibiting Defendants and any successors-in-interest from

enforcing any bankruptcy sale order against Plaintiff personally and

requiring Defendants to segregate, delete, or return Plaintiff's genetic data

rather than treat it as a general estate asset.

**JURY TRIAL DEMAND:**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: September 7th, 2025

**Hector Gutierrez**, Plaintiff Pro Se